[Crim. No. 20901. Second Dist., Div. Two. Mar. 14, 1972.]

THE PEOPLE, Plaintiff and Appellant, v.
EARL LEE WICKERS, Defendant and Respondent.

COUNSEL

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, Joseph P. Busch, Jr., District Attorney, Harry Wood and Daniel L. Lieberman, Deputy District Attorneys, for Plaintiff and Appellant.

Richard S. Buckley, Public Defender, James L. McCormick, Dale C. Frailey and Edward Van Gelder, Deputy Public Defenders, for Defendant and Respondent.

OPINION

**ROTH, P. J.**—People appeal from an order dismissing an information charging the unlawful possession of marijuana in one count. (Health & Saf. Code, § 11530.)

Respondent has adopted the People's statement of facts. We set forth that statement substantially verbatim, except as modified by the court.

Douglas W. Foland, a police officer in the City of Pomona, was on May 28, 1971, assigned to the patrol division. At about 12:57 a.m. Foland who was in a police vehicle with his partner Hernandez, observed a vehicle parked on the Gulf station lot located in the vicinity of the southwest corner of Gary Avenue and Artesia Street in the City of Pomona. There had been numerous armed robberies in the surrounding area in which male Negro suspects were involved, *in the week preceding.* Foland had, during a briefing from Sergeant Pfaff, learned that one or two days earlier the Claremont Police Department had a robbery involving a male Negro described as being in his early twenties, 5 feet, 7 inches tall, weighing 150 pounds, having black hair, a mustache and mutton-chop sideburns. The weapon used in the course of this robbery the officer believed to be a machete. Also within the preceding seven days, there had been a robbery in the area of Upland or Cucamonga involving a male Negro who had used a stocking to cover his face.

The Gulf station was open for business and its lot was surrounded by suspended lights and visibility conditions were almost as good as those during daylight hours. The officer observed respondent seated behind the steering wheel of the parked vehicle, a 1968 Riviera, black or grey. There was one other person in the car. After observing respondent Foland contacted the attendant of the service station to discover how long the occupants of the vehicle had been at the location and whether they had asked the attendant for service. The attendant indicated that the vehicle had

been there for some time, that he did not know the reason for the presence of the vehicle or its occupants, and that the occupants had not contacted him.

In view of the numerous armed robberies in the surrounding area within the preceding week involving male Negro suspects, the officer then contacted the occupants of the vehicle. Foland asked respondent Wickers for his driver's license and why he was at the location, explaining that he was concerned about the situation and wondered why Wickers was parked. Wickers indicated that he was awaiting the arrival of a relative of his passenger who would show him the way to his home. At this time Foland took Wickers' license and a partially filled-out field interrogation card from his partner, Officer Hernandez, told Wickers to remain on the scene, and began to check for possible warrants. While he was in his police vehicle in front of Wickers' car, the passenger exited Wickers' car and was speaking with Hernandez. At this time a new model maroon Riviera pulled onto the lot. The passenger entered this vehicle and he and the driver of the vehicle left the location, driving across the lot without lights at a high rate of speed, proceeding westbound on Artesia, still without lights. Up to this point, approximately five minutes had elapsed from Foland's first contact with Wickers.

Foland left the police car taking a handy-talkie radio and his partner, Hernandez, left the location in pursuit of the maroon Riviera. Foland contacted respondent Wickers again and asked him to step away from the police unit which Wickers did. The officer had Wickers come to the passenger side of Wickers' vehicle. Because of the sudden actions of the passenger in leaving the location, the officer had Wickers place his hands on the vehicle and proceeded to look into the vehicle in an attempt to discover the reason for the passenger's rapid departure. The officer, who was unsure of what crime might have been committed or whether he had in fact interrupted a possible armed robbery or someone waiting to commit a robbery, was looking around the vehicle primarily for a weapon. Foland did not frisk or pat down Wickers, apparently because Wickers was clad in tight fitting pants and shirt which would have revealed a weapon, had Wickers been carrying it on his person. The lighting conditions were excellent and the officer looked through the windshield of the vehicle in an attempt to look under the front seat as much as possible and then looked through the side window at the rear seat on the passenger side. At this time Foland observed on the back seat of the vehicle on the passenger side two jackets, one of brown corduroy and the other a brown leather or simulated leather jacket. The officer observed the pocket of the top coat, the brown corduroy coat, which was open so that there was a two or three inch gap between the lips of the pocket and could see therein a plastic bag con-

taining a green leafy substance which the officer believed to be marijuana. The officer asked respondent Wickers to whom the coat belonged and received a response to the effect that the coat belonged to Robert, the passenger who had left. The officer then reached inside the vehicle, retrieved the jacket, removed and inspected the contents more closely, displayed the contents to respondent Wickers and advised Wickers that he was under arrest for possession of marijuana. Foland then reached inside the vehicle and removed the second coat. The respondent indicated that the coat belonged to him. The officer examined the pockets of this coat in search of further contraband and discovered two hand-rolled marijuana cigarettes therein.

The entire series of events at bench is bisected by the act of Wickers' passenger in getting into the second vehicle, the maroon Riviera, which was immediately driven away "at a high rate of speed" and without lights. It was after this event that Wickers was told to put his hands on the vehicle and that Foland began looking for a weapon in the car. Five minutes had elapsed up to this point and even after his companion's precipitate exit, Wickers was not frisked but merely detained at the side of the car.

The discovery of the marijuana was concededly lawful and was (and is) not challenged by Wickers.

█ Wickers' initial detention, effected prior to the arrival of the second vehicle, was lawful, if in fact it was a "detention." The interference with Wickers' right to privacy (see *People* v. *Woods,* 6 Cal.App.3d 832, 835-836 [86 Cal.Rptr. 264]) was minimal. Foland explained to him the reason for the very inquiry he was making, having first ascertained, from the station attendant that Wickers was conducting no business on the premises. Wickers was not told to leave his vehicle and was not frisked. He was, however, told to remain at the location while the warrant check was being run. Given the fact of two recent robberies in the area to which the police had been alerted,[1] the time of night, and the fact that Wickers was parked at the station, Foland's decision to run a warrant check on Wickers was justified. The resulting detention was lawful since Wickers' activity in parking at the station was under the circumstances sufficiently unusual, and its connection to a possibly impending robbery sufficiently apparent, to warrant police investigation. (*People* v. *Henze,* 253 Cal.App.2d 986, 988 [61 Cal. Rptr. 545].)

█ It is noteworthy that at bench ". . . consideration must be given

[1]The suspects in the robberies, as well as the occupants of Wickers' car, were Negroes.

as well to the necessity for immediate action by the police, such as that which exists when the mission of the police is to prevent rather than to detect a crime . . . ." (*People* v. *Woods, supra*, 6 Cal.App.3d at p. 837.)

The speedy exit of Wickers' companion in a car without lights which could reasonably be interpreted as flight (see *People* v. *Villareal,* 262 Cal. App.2d 438, 444 [68 Cal.Rptr. 610]) infused the situation with a serious and suspicious complexion. Wickers was not subjected to a frisk. He was ordered to put his hands to the car, apparently to keep them in the officer's sight. The situation at bench aggravated by the sudden activity described was unusual. It was reasonable and logical for Foland to conclude that Wickers was connected with it, and that the commission of a crime was involved. (*People* v. *Henze, supra.*) Detention was justified, the apparent purpose of which concedely and plainly was to uncover weapons.[2] (*Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868].)

Wickers' contention that the detention was unlawfully prolonged is not warranted by the facts. The initial purpose of the detention, reenforced, as we have seen, by the flight of Wickers' companion, was to prevent the commission of a robbery or other violent crime. The five, or even ten minutes, which span the entire series of events at bench, was a period of time reasonably necessary to carry out the purpose of that detention. (*Willett* v. *Superior Court,* 2 Cal.App.3d 555, 559 [83 Cal.Rptr. 22].) In fact, it is difficult to see how the officers could have acted with more care and responsibility.

The order is reversed.

Herndon, J., and Fleming, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 10, 1972. Peters, J., was of the opinion that the petition should be granted.

---

[2]The People offered to prove their discovery of a loaded .32 caliber automatic inside the parked vehicle.