[Crim. No. 20293. Oct. 25, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY SANCHEZ McGAUGHRAN, Defendant and Appellant.

## COUNSEL

Paul N. Halvonik and Quin Denvir, State Public Defenders, under appointment by the Court of Appeal, Clifton R. Jeffers and Ezra Hendon, Chief Assistant State Public Defenders, for Defendant and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein, Linda Ludlow and David Schneller, Deputy Attorneys General, for Plaintiff and Respondent.

D. Lowell Jensen, District Attorney (Alameda), John J. Meehan, Assistant District Attorney, and Rodney J. Blonien as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**MOSK, J.**—Defendant was convicted of burglary committed by breaking into a locked automobile with intent to steal. (Pen. Code, § 459.) On this appeal from the judgment, he contends primarily that the superior court should have granted his pretrial motion to suppress the evidence on the ground of illegal search and seizure. (Pen. Code, § 1538.5.) We conclude that his point is well taken and the judgment must be reversed.

The operative facts are without dispute. Early on a weekday afternoon Police Officer Thomas of the City of Larkspur, Marin County, was on patrol in a marked vehicle in the vicinity of Redwood High School. He observed a Plymouth automobile proceeding in the wrong direction on a one-way public street that crosses the high school parking lot. Because of the violation, the officer drove up behind the vehicle and activated his red flashing light. As he did, he saw the person in the front passenger position turn around and reach over the back of the seat towards the floor. Both cars then stopped at the curb, and Thomas approached the driver of the Plymouth, defendant McGaughran. Thomas explained why he had stopped the car, and asked for identification. Defendant produced his driver's license, showing his address to be in San Francisco. Thomas thereupon asked for the driver's license of the passenger, Walter Acosta; it was presented, and also showed a San Francisco address. The two men told Thomas they were lost and were looking for the Marin County Juvenile Hall, a facility that the officer knew was several miles away. This discussion took three or four minutes. Thomas then returned to his patrol car and initiated a radio check for outstanding arrest warrants in both names. Some 10 minutes later the dispatcher called back and reported an Alameda County burglary warrant for defendant and two traffic warrants for Acosta.

Upon learning of the pending charges against the two men, Thomas called for assistance and requested a confirmation of the warrants. Officer Fischer arrived in 5 minutes in response to the call, and the warrants were confirmed by radio some 20 to 25 minutes later. Defendant was then arrested on the burglary warrant, pat-searched, and seated in Fischer's patrol car. He asked Fischer to return to the Plymouth to retrieve his jacket and wallet. Fischer complied, and found the wallet lying open on the dashboard, disclosing a methadone treatment card from San Francisco. On the back seat he saw an open canvas bag containing several screwdrivers, a set of small wrenches, and a pair of pliers.

Thomas questioned Acosta about his outstanding traffic warrants. The latter replied that if he were allowed to make a telephone call he could raise the necessary bail, and defendant said in such event he would release the Plymouth to Acosta so that he could return to San Francisco.[1] A quick inspection of the car revealed no weapons, and Acosta was permitted to drive it to the Larkspur police station, preceded by Thomas and followed by Fischer in their respective vehicles. After they arrived at the station, Fischer searched under the front seat of the Plymouth and found a citizens band radio that had been stolen earlier the same day from a car parked about a mile from the scene of the arrest. Examination of that car revealed one door had been broken open, and defendant's fingerprints were on the door. The present prosecution arises from that burglary.

## I

At the outset it will be helpful to narrow the scope of the problem by noting what is *not* involved in this case. First, in contrast to such cases as *Delaware* v. *Prouse* (1979) 440 U.S. 648 [59 L.Ed.2d 660, 99 S.Ct. 1391], and *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957], the issue here is not whether Officer Thomas lawfully stopped defendant for the purpose of investigating criminal activity. Defendant acknowledges that he was traveling in the wrong direction on a one-way street, and that it was proper for the officer to stop him for the traffic violation. (Veh. Code, § 21657.) The question, instead, is whether the period of time during which Thomas thereafter conducted the warrant check on defendant and Acosta was a lawful detention.[2]

Second, just as this is not a "stop" case, so also it is not a "search" case. In distinction to *People* v. *Grace* (1973) 32 Cal.App.3d 447 [108 Cal.Rptr. 66], *Pendergraft* v. *Superior Court* (1971) 15 Cal.App.3d 237 [93 Cal.Rptr. 155], and *People* v. *Lingo* (1970) 3 Cal.App.3d 661 [83 Cal.Rptr. 755], during the detention herein Officer Thomas did not undertake to search either the driver's person or his car. Indeed, in conducting a warrant check the officer does not "search" at all in the constitutional sense: the object of the inquiry—an outstanding arrest warrant—is not a personal document that an individual legitimately expects will remain private,

---

[1] The car was owned by defendant's wife.

[2] Only that 10-minute detention is before us. If it was valid, Officer Thomas had probable cause to arrest defendant and Acosta on the outstanding warrants and could lawfully detain them for the additional 20 to 25 minutes necessary to confirm those warrants.

such as his bank statements *(Burrows v. Superior Court* (1974) 13 Cal.3d 238, 242-248 [118 Cal.Rptr. 166, 529 P.2d 590]); rather, it is a court order recorded in the government's own files compiled from official reports of law enforcement agencies and the Department of Motor Vehicles, and is retrieved by use of state and local police communications systems.

Third, this is not a case in which an unlawful detention led merely to the discovery of an outstanding warrant and the defendant's arrest thereon. In that event the illegality is no bar to a prosecution on the pending charge, for a defendant is not immunized from criminal liability simply because he was arrested on a warrant that had been improperly issued or executed. (See, e.g., *Frisbie v. Collins* (1952) 342 U.S. 519, 522 [96 L.Ed. 541, 545-546, 72 S.Ct. 509]; *People v. Bradford* (1969) 70 Cal.2d 333, 344 [74 Cal.Rptr. 726, 450 P.2d 46].) It is only when the arrest on the warrant thus discovered results in the seizure and use of incriminating *evidence* against the arrestee that he can invoke, as defendant does here, the exclusionary rule. (See, e.g., *Willett v. Superior Court* (1969) 2 Cal.App.3d 555, 559 [83 Cal.Rptr. 22].)

Fourth, the traffic violation justifying the stop herein was not of the limited class of offenses for which the officer is either required or authorized to take the defendant into custody and transport him before a magistrate for the filing of a complaint. (Veh. Code, §§ 40301-40303; see *People v. Superior Court (Simon)* (1972) 7 Cal.3d 186, 199-200 [101 Cal.Rptr. 837, 496 P.2d 1205].) In those cases the right to custody manifestly includes the right to detain for a warrant check.[3] We deal here, by contrast, with one of that much larger class of traffic violations for which the offender cannot be taken into custody and removed from the scene. In such instances, provided the offender satisfactorily identifies himself (see *Simon* at p. 201 of 7 Cal.3d), the officer must simply prepare a written notice to appear (i.e., a citation or "ticket") reciting the particulars of the violation (Veh. Code, § 40500, subd. (a)), and must release the offender when he signs a written promise to appear *(id.,* § 40504, subd. (a)).[4]

---

[3]Even the right to custody, of course, is qualified by the requirement of the cited statutes (see also Pen. Code, § 849, subd. (a)) that the defendant be taken before the magistrate "without unnecessary delay." A reasonable detention for a warrant check will ordinarily be deemed a "necessary" delay, but the possibility of excessive detention remains in unusual cases.

[4]"Indeed, such a violator may entirely avoid the necessity for appearing in court: he may choose to deposit the prescribed bail by mail (§ 40510) and, by failing thereafter to appear, forfeit that amount in lieu of fine (§ 40512)." *(Simon* at p. 199 of 7 Cal.3d.)

Fifth, as the record will disclose, the warrant check in the case at bar was not conducted during the period of temporary detention that is permissible even after a traffic stop in the latter class of cases. That period, although brief, is not insignificant. To begin with, it must necessarily include the time required by the officer to write out the citation and obtain the offender's promise to appear pursuant to the above-mentioned statutes. Other code provisions imply that it will include more. Thus upon demand of a police officer every motorist must present for "examination" both his driver's license (Veh. Code, § 12951, subd. (b)) and the registration card of the vehicle (*id.*, § 4462, subd. (a)).[5] If the officer reasonably believes the vehicle is in a dangerously unsafe condition, he may in addition submit it to appropriate "inspection" and "tests." (*Id.*, §§ 2804, 2806.) And although not specifically compelled by law, certain other steps customarily taken as matters of good police practice are no less intimately related to the citation process: for example, the officer will usually discuss the violation with the motorist and listen to any explanation the latter may wish to offer; and if the vehicles of either are exposed to danger, the officer may require the driver to proceed to a safer location before the investigation continues. (See generally *People* v. *Mack* (1977) 66 Cal.App.3d 839, 848 [136 Cal.Rptr. 283]; *People* v. *Grace* (1973) *supra,* 32 Cal.App.3d 447, 452; *People* v. *Lingo* (1970) *supra,* 3 Cal.App.3d 661, 663-664.)

Each of the foregoing steps, of course, requires a certain amount of time to accomplish. Nor is much less time consumed if the officer in his discretion (see Pen. Code, § 849, subd. (b)(1)) decides not to issue a citation but instead to release the motorist with a warning against committing future violations of the same kind: the officer is still entitled to examine the driver's license and registration, carry out any appropriate equipment inspection and tests, and satisfy himself that the motorist fully understands the conduct to be avoided before permitting him to go his way. In either event, therefore, the law contemplates that the officer may temporarily detain the offender at the scene for the period of time necessary to discharge the duties that he incurs by virtue of the traffic stop. ■■■ If a warrant check can be completed within that same period, no reason appears to hold it improper: because it would not add to the delay already lawfully experienced by the offender as a result of his violation, it would not represent any further intrusion on his rights.[6]

[5]These two documents are also the source of most of the information needed by the officer to complete the citation. (*Id.,* § 40500, subd. (a).)

[6]As defendant concedes, to the foregoing period of time may lawfully be added the few moments necessary for the officer to return to his vehicle with the driver's identification

## II

■ By the foregoing process of exclusion, we reach the precise issue in the case at bar. It is undisputed that Officer Thomas initially detained defendant for a period of "about three or four minutes" to advise him why he had been stopped, to examine the driver's licenses of both defendant and Acosta, and to discuss their explanation that they were lost. It is also undisputed that Thomas did not in fact issue a citation to defendant for driving in the wrong direction on the one-way street, and indeed never intended to do so. The street in question is a two-way thoroughfare on either side of the Redwood High School parking lot, but while it crosses that lot it becomes one way only. Thomas admitted at the hearing that the traffic pattern was confusing, that although he had seen a number of other drivers make the same "mistake" as defendant, he had never cited any of them; and that it was his "personal policy" in this situation to give the errant motorists "the benefit of the doubt" and "let them off with a warning." In the circumstances, a brief explanation of the unusual traffic pattern and a warning against repeating the mistake would have completed Thomas' duties as he conceived them.

---

and initiate the warrant check by use of radio or computer terminal.

The Attorney General and the amici curiae supporting him vigorously claim that warrant checks are in fact completed in less time than an officer ordinarily needs to carry out his functions after a traffic stop. They allege in particular that because of modern communications systems and advances in computer technology the usual response time to a warrant check is now from a few seconds to less than four minutes, depending on the method used and the number of inquiries being processed. Defendant replies that such allegations are beyond the scope of proper judicial notice, and holds up the present case as typical of the delays experienced in conducting warrant checks. We are inclined to believe that reality lies somewhere between these two extremes: i.e., that under ideal conditions warrant checks can now be swiftly completed, but that in a still significant number of places in the state—presumably diminishing with the spread of the new technology—the ideal is not yet attained. The proceeding before us evidently falls into the latter category, but nothing we say here is intended to foreclose proof of the Attorney General's claim in an appropriate case.

The Attorney General also relies on a series of four decisions of the Court of Appeal holding that after a stop for a traffic violation it is not unreasonable for the officer to detain the motorist "for a short period of time" to run a warrant check. (*People* v. *Gilliam* (1974) 41 Cal.App.3d 181, 188 [116 Cal.Rptr. 317]; *People* v. *Bremmer* (1973) 30 Cal.App.3d 1058, 1061-1062 [106 Cal.Rptr. 797]; *People* v. *Brown* (1969) 272 Cal.App.2d 448, 450 [77 Cal.Rptr. 438]; *People* v. *Elliott* (1960) 186 Cal.App.2d 185, 189 [8 Cal.Rptr. 795].) The rule is sound if the "short period" is construed to mean no more than the time needed by the officer to perform his functions as discussed herein. It is true the rule was criticized in *People* v. *Grace* (1973) *supra,* 32 Cal.App.3d 447, 453, footnote 3, on the belief that its "inevitable result" will be that in every case the officer will delay completing his duties until he receives a response to his warrant inquiry. We are unwilling to engage in such a wholesale presumption of official misconduct; but we agree that if in any individual case the defendant can prove the officer did in fact delay completion of his duties for this purpose, the rule will be inoperative. This is no more than a corollary of the rule itself.

Instead of promptly releasing defendant and his companion with such a warning, Thomas returned to his patrol car and detained them for an additional period while he placed a call over police radio to inquire whether there were outstanding warrants in either name, and waited for an answer to that call. It is undisputed that this second period of detention lasted "approximately ten minutes." Narrowed to the facts of the case, accordingly, the issue is whether a police officer who (1) has stopped a motorist for a traffic violation for which the latter cannot be taken into custody and (2) has already detained the offender for the period necessary to perform his functions arising from the violation, can thereafter lawfully detain him for an additional period of time solely for the purpose of conducting a warrant check.

The answer must be in the negative, and it is given both by statute and by Constitution. Vehicle Code section 40504, subdivision (a), commands that when a traffic offender such as defendant herein gives his written promise to appear by signing two copies of the citation, "Thereupon the arresting officer shall *forthwith* release the person arrested from custody." (Italics added.) The statute leaves no room for interpretation: it plainly and unequivocally provides that when the officer has completed his duties flowing from the violation, no further detention—whether for a warrant check or otherwise—is permissible: the motorist must then be released "forthwith." We recognize that defendant here was not in fact cited for the violation and that Officer Thomas proposed simply to release him with a warning. But it would be irrational to assume that the Legislature intended to afford *less* protection to persons whose transgressions are so minor or so excusable that the arresting officer determines they should not even be prosecuted: clearly they too must be released "forthwith" when the officer has investigated the incident and given his warning. In both cases the intent of the Legislature is manifest, and must be obeyed.

The statute, moreover, implements settled constitutional doctrine. It is now beyond question that "just as a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope (*Terry* v. *Ohio,* 392 U.S. 1, 18 [20 L.Ed.2d 889, 903, 88 S.Ct. 1868, 1878]), so may an investigatory detention exceed constitutional bounds when extended beyond what is reasonably necessary under the circumstances which made its initiation permissible." (*Willett* v. *Superior Court* (1969) *supra,* 2 Cal.App.3d 555, 559; accord, *People* v. *Harris* (1975) 15 Cal.3d 384, 390 [124 Cal.Rptr. 536, 540 P.2d 632].) In *Willett* an officer saw the defendant driving with a nonfunctioning taillight and properly stopped him to issue an equipment warning. (Veh. Code, § 2806.) After

examining his driver's license and registration, however, the officer did not promptly issue the warning and release the defendant; instead, he called for police assistance and further detained both the defendant and his two passengers while conducting a warrant check on all three. The inquiry in due course revealed the defendant was a registered narcotics offender who had failed to keep his registered address current, and he was placed under arrest for that offense (now Health & Saf. Code, § 11594). As an incident to the arrest the officers searched the car and found illicit drugs, and the defendant was charged with their possession. The Court of Appeal ordered suppression of the evidence thus found, reasoning in relevant part that "The officers were not justified in detaining Willett beyond what was reasonably necessary to issue him a routine equipment warning. The search of Willett's car was based upon his arrest on information learned well after his detention had exceeded constitutional limitations." (2 Cal.App.3d at p. 559.)

Similarly, in the case at bar the event that made the initial detention permissible was defendant's conceded violation of the one-way traffic pattern. All that was "reasonably necessary" to deal with the offense, however, was for Officer Thomas to examine defendant's license and registration, explain the violation, and then issue either a citation or a warning. The additional period of detention for the purpose of seeking out unrelated arrest warrants in the name of defendant or his passenger was not "reasonably necessary" to that process, and hence "exceeded constitutional limitations" under the foregoing rule.[7]

### III

In the alternative, the Attorney General contends that the additional detention for a warrant check was permissible here because Officer Thomas reasonably suspected that defendant and Acosta were involved in criminal activity. (*People* v. *Herrera* (1975) 52 Cal.App.3d 177, 181 [124 Cal.Rptr. 725] [burglary]; *People* v. *Junious* (1973) 30 Cal.App.3d 432, 437 [106 Cal.Rptr. 344] [loitering about a school for criminal purposes]; *People* v. *Wickers* (1972) 24 Cal.App.3d 12, 16 [100 Cal.Rptr. 732] [robbery].)

---

[7]The Attorney General attempts to distinguish *Willett* by the fact that the warrant check there took 40 minutes rather than 10 minutes. But the difference is one of degree, not of kind. Although the court was understandably disturbed by the long response time shown in the record, it grounded its decision squarely on constitutional principles. The same principles are no less applicable here.

■ We recently summarized the rule that "in order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so; the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question. The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith." (Fn. omitted.) (*In re Tony C.* (1978) *supra,* 21 Cal.3d at p. 893.)

■ In the case at bar Officer Thomas listed the following circumstances when asked why he ran a warrant check on defendant and Acosta: (1) the men were not local residents, but were from San Francisco; (2) they appeared to be lost; (3) they were in the vicinity of a high school but were not of high school age; (4) a substantial traffic in illegal drugs was known to exist at the high school in question; and (5) Acosta turned and reached over the back seat when Thomas activated his flashing light. The Attorney General contends these circumstances reasonably support a suspicion that defendant and Acosta were involved in the sale of narcotics at Redwood High School.

The argument is unconvincing. To begin with, the first three circumstances noted are wholly innocent. The fact that the occupants of the car were residents of a neighboring county is not only devoid of any sinister significance, but may well explain the further fact that they seemed to be lost. Nor is it relevant that they were lost—or found—in the vicinity of a high school. They were not, for example, loitering in its restrooms, locker rooms, playgrounds, or similar portions of the school premises normally frequented only by students (cf. Pen. Code, § 653g); rather, they were driving on a public thoroughfare that happens to cross the school property. There is nothing suspicious in the sight of adults—whether teachers, parents, or ordinary citizens—passing through public areas adjacent to high schools, either on school business or merely en route to another destination.

The next circumstance mentioned by Officer Thomas—that an illicit drug traffic was known to exist at Redwood High School—invokes the "high crime area" rationale. But we have warned that "the justification is so easily subject to abuse that this fact alone should not be deemed sufficient to support the intrusion." (*In re Tony C.* (1978) *supra,* 21 Cal.3d at p. 897.) The contrast between the case at bar and *People* v. *Junious* (1973) *supra,* 30 Cal.App.3d 432, is instructive. There two officers had information that several ice cream vendors around Dorsey High School were dealing in narcotics. The officers, seated in their parked patrol car, began watching the defendant in the cab of an ice cream truck stationed at the curb near Dorsey during school hours. In a period of 20 minutes 7 to 10 juveniles walked up to the truck, spoke with the defendant, but left without purchasing any ice cream. There were three compartments in the truck from which ice cream could be dispensed, but the defendant never opened any of them. Moreover, it was raining throughout this period and none of the youths had raincoats; one of the officers testified it seemed "very odd" that the youths "were standing out in the rain and . . . were getting soaking wet, but no one was buying any ice cream." (*Id.* at p. 437.) The Court of Appeal held that these circumstances supported the officers' reasonable suspicion that the defendant was loitering about the school for criminal purposes. When the officers thereupon asked the defendant for identification, he had none to show that he was in fact an employee of the ice cream company in question, and the driver's license he produced did not give his current address. The Court of Appeal concluded (at p. 438) that these additional suspicious circumstances, when coupled with the foregoing rational suspicion that the defendant was loitering in a high crime area with unlawful intent, justified a brief detention for a warrant check.

No comparable combination of circumstances was shown here: defendant and Acosta promptly and fully identified themselves, and they were not found parked at the curb and engaged in suspicious dealings with juveniles. Indeed, on cross-examination Officer Thomas was specifically asked, "In fact, . . . you didn't see these individuals loitering?" He replied, "No, at the time I saw the subjects they were leaving the area." To vest this conduct with sinister significance would in effect make it lawful for the police to detain for a warrant check every hapless driver who is stopped for a traffic infraction on a street that happens to be "in the vicinity of" a high school—wherever the officer may choose to draw that geographical line. Yet as long as such streets remain open to the public their mere use cannot be deemed a suspicious event, whatever the reputation of the local school.

The final circumstance relied on by Officer Thomas—the observed movement of Acosta in turning and reaching over the back of the seat—invokes the "furtive gesture" rationale. But in *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807 [91 Cal.Rptr. 729, 478 P.2d 449], we rejected a claim that a remarkably similar gesture furnished probable cause to search a vehicle for contraband after an ordinary traffic stop.[8] We there analyzed in detail the dangers of giving too much weight to such gestures, recognizing they are usually totally innocuous and unrelated to any criminal activity. (*Id.* at pp. 817-823.) We concluded that such a gesture can be deemed suspicious only when there are additional facts known to the officer that reasonably give it a guilty connotation, such as "prior reliable information or . . . the officer's personal observation of contraband or a deliberate act of concealment under otherwise suspicious circumstances." (*Id.* at pp. 819-820.) And we criticized as largely inadequate the "additional facts" relied on for this purpose in a number of Court of Appeal decisions. (*Id.* at pp. 824-827.)

In the present case Officer Thomas obviously had no "prior reliable information" that defendant and Acosta were planning to engage in criminal activity, nor did he observe the latter deliberately hide a package or box apparently containing narcotics as in *People* v. *Doherty* (1967) 67 Cal.2d 9, 21-22 [59 Cal.Rptr. 857, 429 P.2d 177]. On the contrary, Thomas admitted on cross-examination that he did not see what Acosta placed on the rear floor of the car; when Officer Fischer later inquired what the object was, Acosta explained it was his lunch—and in fact Fischer subsequently found a brown paper bag in that location containing the typical residue of a picnic meal. Nor were there any other facts known to Thomas that reasonably invested this gesture with a guilty meaning. It is true that *Kiefer* is a search case; but its principle is not so narrow that it cannot fairly be invoked to bar an investigative detention of the occupants of an automobile predicated on a similar unsupported "furtive gesture," and it has been so applied. (*People* v. *Williams* (1971) 20 Cal.App.3d 590, 592 [97 Cal.Rptr. 815].)

In the case at bar we have discussed the allegedly suspicious circumstances seriatim simply because we cannot discuss them simultaneously. Like the trial court, however, in determining their sufficiency we view them not in isolation but in their totality, taking account of the effect

---

[8]After the officer in *Kiefer* switched on his red flashing light, the woman passenger in the front seat "turned and put her arm over the back of the seat, then faced forward again, bent down toward the floor, and reassumed a normal sitting position." (*Id.* at p. 811.)

that each may have in supporting the others. (See *People* v. *Gale* (1973) 9 Cal.3d 788, 795-799 [108 Cal.Rptr. 852, 511 P.2d 1204].) Having done so, we conclude for the reasons stated herein that when Officer Thomas extended the detention beyond the period necessary to perform his duties arising from the traffic stop, he did not do so on "specific and articulable facts" that could support a rational suspicion that defendant and his companion were involved in "some activity relating to crime." (*In re Tony C.* (1978) *supra*, 21 Cal.3d at p. 893.) It follows that the additional detention cannot be sustained on this ground.

The evidence here challenged was the direct product of exploitation of the unlawful detention, and should have been suppressed. It was essential to the case against defendant, and the ensuing conviction therefore cannot stand. Accordingly, we need not reach defendant's further contention that Officer Fischer had no probable cause to search his car at the police station.

The judgment is reversed.

Clark, J., and Manuel, J., concurred.

**BIRD, C. J.,** Concurring and Dissenting.—I concur in the result reached by the majority. However, I cannot join the reasoning employed in parts I and II, *ante*. Today, this court creates a rule which not only represents an unneeded exception to the usual Fourth Amendment[1] detention analysis, but leads to absurd results. Further, officers acting in the field are given an impractical rule to enforce.

The process of "running a warrant check" on a detained individual involves three steps. The officer must first ascertain the identity of the detained individual and then initiate the warrant check. This second step normally involves returning to the patrol car, using the radio to reach the dispatcher or warrant officer, and communicating to this person the information concerning the identity of the detained individual.[2] The third and final step in the process is to await the reply or the "return" on the warrant check.

---

[1]The phrase "Fourth Amendment" as used in this opinion refers to both the state and federal guarantees against unreasonable searches and seizures. (See *People* v. *Triggs* (1973) 8 Cal.3d 884, 891-892, fn. 5 [106 Cal.Rptr. 408, 506 P.2d 232].)

[2]It is now within the technical capacity of some police departments to place computer terminals directly into individual patrol cars so that the patrol officers will have almost instantaneous input into a warrant computer.

In the usual traffic detention case, no Fourth Amendment problem is posed when an officer carries out the first step of this process since the officer is entitled to inquire about the driver's identity as a necessary adjunct to the investigation of the initial traffic offense. (Maj. opn., *ante,* at p. 584.) However, constitutional difficulties may arise in connection with the second and third steps. Initiating a warrant check and awaiting the return are not activities that are directed at resolving the traffic offenses which authorized the stop in the first place. Thus, those portions of a traffic detention which are used solely to initiate or complete a warrant check cannot be deemed a detention to investigate the traffic offenses.

Under well-established constitutional rules which the majority recognize, the scope of a detention is limited by the circumstances which justified its inception and by any specific and articulable facts lawfully discovered thereafter. (See maj. opn., *ante,* at p. 586.) This settled rule can easily be applied to warrant checks run during traffic stops. The scope of a lawful, routine traffic detention must be limited to what is necessary to investigate the traffic infraction itself. It logically cannot be expanded to permit using a portion of the detention solely to investigate the separate question of whether there are unrelated arrest warrants in the name of the driver. ▮▮ ▮▮▮▮▮ Therefore, unless other facts are discovered which suggest a warrant check will be fruitful, no portion of a traffic detention should be used for that purpose alone.[3][4] (See *In re Tony C.* (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957]; *People* v. *Bower* (1979) 24 Cal.3d 638 [156 Cal.Rptr. 856, 597 P.2d 115].)

The majority articulate a different rule. They set forth a rule that would allow a warrant check to be run during the lawful detention of any driver—*even if there is no reasonable basis for believing the warrant check will be fruitful.* If the officer does not detain the driver beyond the time

---

[3]I agree with my colleagues in the majority that no such additional facts are present in this case. (Maj. opn., *ante,* part III.)

[4]Clearly, the act per se of running a warrant check does not implicate the Fourth Amendment. (See maj. opn., *ante,* at pp. 582-583.) Only if an individual is being *detained* while a warrant check is run will Fourth Amendment considerations arise.

Even then, there will be no constitutional violation in running a warrant check if the detained individual is simultaneously being investigated lawfully for other offenses, such as a traffic infraction. For example, if one officer initiates and completes a warrant check while a second officer carries out his duties with respect to the traffic infraction which justified the stop, the driver has not been unlawfully detained.

However, if at any point in the traffic detention the focus of the investigation shifts away from the traffic offense and turns to the warrant check alone, that expansion of the scope of the detention is unlawful unless justified by suspicious circumstances other than the traffic infraction itself.

which would have been " 'reasonably necessary' to deal with the [traffic] offense," his actions are legal. (Maj. opn., *ante,* at p. 587.) If an officer would "reasonably" need to detain a driver for a total of five minutes to "deal with" an infraction, the officer could detain the driver a total of five minutes to await the completion of a warrant check.

This rule is unworkably vague. How is it possible to determine what amount of time would have been "reasonably necessary" for an officer to discharge the duties he or she had with respect to the traffic infraction itself? I submit, it is not possible. Further, the rule requires the officer and the judge to determine the duration of a past event *which never occurred,* i.e., the length of time the traffic detention *would* reasonably *have required* if the officer had not run the warrant check. Not only must past history be thus reorganized, but a determination must be made as to how many of the officer's actions that never occurred would have been reasonably "necessary" to perform duties that may have been only partly performed.[5]

I have previously expressed concern that the guidelines which the court sets down for the police must be clear in order to ensure that the police can obey the commands of the Fourth Amendment. (*In re Tony C., supra,* 21 Cal.3d at p. 902 et seq. [conc. & dis. opn. of Bird, C. J.].) Vague and unclear rules afford officers no guidance as to what the Constitution might require of them in an impromptu situation in the field. Similar problems arise in the courtroom leading to inconsistent and unpredictable applications of the sanction of exclusion of evidence. Without predictable sanctions, there is no incentive for officers to learn the rules or attempt to conform to them; the proficient and the careful are no more likely to be rewarded and no less likely to be sanctioned than the ignorant and the reckless. (See *id.,* at pp. 906-907.)

A separate defect in the majority's rule is its potential for easy abuse. Since a warrant check during a traffic detention does not have to be justified on any factual basis, the decision as to whether or not to run a warrant check will turn not upon the driver's apparent involvement in crime but upon the unconstrained and standardless discretion of the officer. The United States Supreme Court has recently noted the " 'grave danger' of abuse" which may result when decisions involving the Fourth

---

[5]In this court's first opinion in this case, a majority of the court expressed similar reservations. "For a court to decree at a later date precisely how much time 'would have been' necessary to perform the officer's duties in any given case would be at best hindsight and at worst sheer speculation." (See 149 Cal.Rptr. 584, 593.)

Amendment are left wholly to "the unbridled discretion of law-enforcement officials." (*Delaware* v. *Prouse* (1979) 440 U.S. 648, 661, 662 [59 L.Ed.2d 660, 672, 99 S.Ct. 1391, 1400].) "To insist upon neither an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . .' " (*Ibid,* quoting *Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906, 88 S.Ct. 1868].)

Finally, the rule proposed by the majority leads to absurd results. Consider this factual setting. Suppose five minutes is "reasonably necessary" to perform the duties associated with a particular infraction for which an officer has made a traffic stop. The officer spends one minute obtaining identification from the driver and four minutes in his patrol vehicle initiating and awaiting a reply on a warrant check. The check reveals that the driver has no warrants. The officer has now used up the five minutes which the majority have allotted him. Therefore, he must permit the driver to drive away and he cannot take the extra time necessary to write a citation as any detention beyond the five-minute period would be unconstitutional.

Under the majority rule if the officer decides to run a warrant check, he runs the risk that he will be precluded from issuing a citation or otherwise conducting his duties with respect to the traffic infraction for which he made the stop in the first place. This is not an unlikely risk. The vast majority of California drivers have no warrants outstanding[6] and may thereby become potentially immune from traffic citations. An ironic result, indeed!

In my view, the majority went astray very early in this case. At the point they decided to permit the scope of a traffic detention to be

---

[6]In our prior opinion in this case, the court concluded that "2 percent of California drivers—at the very most—may be operating with suspended or revoked licenses" and "less than 2 percent" of the licensed drivers have traffic warrants outstanding. (149 Cal.Rptr. at pp. 591, 592.) While amici do not quarrel with this determination, their statistics based on all warrant checks run by the Los Angeles County Sheriff suggest the figures may be somewhat higher.

In addition to disclosing traffic warrants, a warrant check may also reveal felony and misdemeanor warrants. The information supplied by the Los Angeles Sheriff suggests that felony warrants are discovered in 1 percent of all warrant checks and nontraffic misdemeanor warrants in 5 percent.

I use these figures as suggestive only. Whatever may be the precise proportion of drivers with outstanding warrants, it is clearly quite low.

expanded to permit a warrant check even when there are no suspicious circumstances indicating the warrant check would be fruitful, the court set down an unworkable rule and a dangerous precedent. To my knowledge, there is no case precedent which would permit the scope of a search or seizure to be intensified without some showing of a factual justification. Certainly, there is no need to create an exception for routine traffic detentions. The overwhelming majority of California drivers who commit minor traffic infractions simply do not have arrest warrants outstanding.

In cutting loose traffic detention warrant checks from the requirement of suspicious circumstances, to which all other constitutional "seizures" are tied, the majority have not been able to articulate a workable and sensible rule. To that extent, the court has made the job of our police and judges that much more difficult and unpredictable; and the freedom of our citizens from unreasonable searches and seizures that much more precarious.

It is true that the intrusion appears minor, the indignity minimal, the event commonplace. However, "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." (*Boyd* v. *United States* (1886) 116 U.S. 616, 635 [29 L.Ed. 746, 752, 6 S.Ct. 524].)

**NEWMAN, J.**—I concur, except that I would rely solely on the California Constitution.

**TOBRINER, J.,** Concurring and Dissenting.— ▇ I concur in the majority's conclusion that the running of a warrant check, in itself, does not violate an individual's constitutional rights and that, as a consequence, the police may validly conduct such a warrant check during the time an individual is properly detained for a traffic violation. (*Ante,* p. 584.) I dissent, however, from the majority's determination that on the

facts of this case the trial court erred in upholding the validity of the brief 10-minute detention and warrant check at issue here. On the basis of the record before us, I have concluded that specific and articulable facts known or apparent to the police officer in question caused him reasonably to suspect that some activity relating to crime had taken place and that defendant was involved in that activity and hence constitutionally justified his brief extended detention of defendant.

"[W]e have consistently held that circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning." (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]. See also *People* v. *Martin* (1956) 46 Cal.2d 106, 108 [293 P.2d 52]; *People* v. *Blodgett* (1956) 46 Cal.2d 114, 117 [293 P.2d 57]; *People* v. *Simon* (1955) 45 Cal.2d 645, 650 [290 P.2d 531].) The federal rules governing police investigations and arrests are in accord, for as the United States Supreme Court recognized in *Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906-907, 88 S.Ct. 1868], "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest."

We have recently elaborated on the grounds necessary to justify such an investigative stop or detention. In *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957], we held that "in order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience . . ., to suspect the same criminal activity and the same involvement by the person in question. The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. . . ." (Fn. omitted.)

To summarize the circumstances involved in the case before us: Officer Thomas witnessed defendant commit the traffic violation of driving in the

wrong direction on a one-way street. As Officer Thomas drove up behind defendant, he saw defendant's passenger lean over the back of the seat, apparently moving something on the rear floorboard. When officer Thomas approached defendant to question him, the officer noted that although defendant had been driving on the one-way street which crosses the Redwood High School parking lot, defendant was obviously not a high school student but a far older person. On Thomas's request for identification, defendant produced a driver's license showing a San Francisco address. Appearing somewhat confused, defendant explained that he was looking for the Marin County Juvenile Hall, a facility which Thomas knew was distant from that locality. At that point Thomas initiated the radio check for outstanding arrest warrants which the majority here rule "constitutionally unreasonable."

On the basis of the above-mentioned facts the trial court held Officer Thomas' action lawful and admitted subsequently discovered contraband. As the trial court explained, "obviously the facts of this case are like any . . . questions of search and seizure, and the magistrate must consider the *totality of the circumstances* which is, as they testified; number one, . . . whether they are acting honestly and in good faith in the manner in which they proceeded, and taking the *totality of the circumstances,* I believe they did act reasonably . . . ." (Italics added.) I would affirm the trial court.

In *People* v. *Gale* (1973) 9 Cal.3d 788, 795-799 [108 Cal.Rptr. 852, 511 P.2d 1204], we held that the reasonableness of the duration of a detention must be governed by an examination of the "totality of the circumstances." In the present case, Officer Thomas himself articulated the *combination* of specific factors upon which he based his decision to detain defendant: "The fact that they were confused, were from San Francisco, were in an area of the high school which has high drug traffic, and were not of high school age." Officer Thomas had witnessed defendant's traffic violation, and justifiably mistrusted defendant's claim to be looking for the distant Marin County Juvenile Hall. Furthermore, Thomas understandably felt "some trepidation or concern or suspicion" at observing defendant's passenger "actually lean over the seat"; as Officer Thomas testified, "it is not uncommon to glance back, but it is very uncommon for someone to actually lean over the seat." While a "furtive gesture" or a San Francisco address *alone* may not suffice to sustain a detention, nevertheless the *combination* of factors apparent to Officer Thomas in the present case reasonably deepened Thomas' suspicion; because Officer Thomas "fairly entertained growing doubts as to the veracity of defend-

ant and his companion" (*People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632], cert. den. (1976) 425 U.S. 934 [48 L.Ed.2d 175, 96 S.Ct. 1664]), Officer Thomas properly extended his investigation.

In light of the totality of these suspicious circumstances, Officer Thomas reasonably detained defendant for a short period for purposes of investigation. In *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 95-96 [41 Cal.Rptr. 290, 396 P.2d 706], we recognized that "a police officer in the discharge of his duties may detain and question a person when the circumstances are such as would indicate to a reasonable man in a like position that such a course is *necessary to the proper discharge of those duties.*" (Italics added.) As Officer Thomas testified in the present case, his original intention on witnessing defendant's traffic violation was to detain defendant "for purposes of investigation." Clearly Thomas did not exceed reasonable bounds in interpreting his duty to include a few minutes' detention to conduct a warrant check, particularly in light of his well-grounded suspicions as to defendant's bona fides. The warrant check itself, as defendant himself concedes, constituted no invasion of defendant's privacy. The 10-minute period at issue did not expose defendant to more than minor inconvenience or embarrassment:[1] certainly defendant's detention did not involve the personally offensive and stigmatizing treatment of an arrest or search.[2]

The detention in the case before us involves a minor and unintrusive law enforcement procedure. Although I agree that the police should not be permitted unduly to detain a motorist to conduct an extended warrant or record inquiry, I believe that the detention in the instant case falls within constitutional bounds. In weighing the competing interests here—a

[1] According to testimony at trial, Officer Thomas remained in his patrol car during the warrant check, and defendant and his passenger "were in their vehicle talking." The curiosity of passersby focused on defendant's predicament only after defendant had been arrested and handcuffed.

[2] This court's prior decisions in *People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186 [101 Cal.Rptr. 837, 496 P.2d 1205] and *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559] are clearly distinguishable. In those cases we held that probable cause to arrest a traffic offender, "no matter how persuasive, is neither a necessary nor a sufficient condition" for a warrantless search of his vehicle or person for contraband. (3 Cal.3d 807, 815; 7 Cal.3d 186, 191.) To justify such a search, we concluded, there must be independent probable cause to believe that contraband is present.

By contrast in the instant case we are concerned with neither a search of the driver's person nor a search of his vehicle and, as I have explained, circumstances short of probable cause may suffice to justify defendant's extended detention. Thus, the majority err in applying the constitutional standard of *Kiefer* to the minimal intrusion which the present defendant may have experienced.

function inherent in all judgment—I cannot believe that a fleeting moment of delay to a motorist, provided that it is indeed of very limited duration, is so massive an intrusion as to foreclose the quite legitimate procedure of law enforcement which the warrant check constitutes.

Richardson, J., concurred.