[Crim. No. 5946. Fifth Dist. Jan. 18, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES THOMAS HARNESS, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

¹Part II (only) is not published, as it does not meet the standards for publication contained in rule 976(b), California Rules of Court.

## COUNSEL

Bruce S. Wiener, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, and Nancy Sweet, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**ANDREEN, J.**—Appellant was convicted of attempted kidnaping (Pen. Code, §§ 207/664);[2] and assault with force likely to produce great bodily injury (§ 245, subd. (a)). In this appeal he raises the question: under what circumstances may police detain a citizen for sufficient time to complete a field interrogation card?

The facts may be stated briefly. On June 26, 1981, a woman pedestrian was followed by a man who pulled his car up behind her and parked. The man got out of the car and, saying nothing, grabbed her, twisted one arm behind her back and put one hand on her throat. He told her if she did not get into the car he would kill her. Although she struggled with him, he eventually forced her into the open passenger door whereupon she agreed to go with him if he would let go of her.

As her assailant then walked around the car to the driver's door she opened her door and fled. Some passersby interceded; the assailant drove away. This occurred sometime after 7:30 p.m. The victim and passersby gave a description of the suspect and stated he was driving a yellow Vega.

At 8:07 the same evening, police Officer Rhyman received a broadcast of the crime and a description of the vehicle involved as "a yellow vehicle, possibly a Ford Pinto or a Maverick or smaller vehicle."[3]

At about 8:20 p.m. Rhyman was advised by a passing motorist that a yellow car was stuck on a nearby railroad track. Rhyman went to the described area

---

[2]All statutory references are to the Penal Code unless otherwise indicated.

[3]There was no evidence of the actual broadcast. The quoted testimony was given by Officer Rhyman at the suppression hearing.

and observed a vehicle being pushed off the tracks by three or four people.[4] The car was in an area 35 to 40 yards from the nearest street.

As Rhyman approached the vehicle, at approximately 8:22 or 8:23 p.m., appellant proceeded to enter the car. Rhyman left his car and told appellant to "Stop a minute"; Rhyman wanted to check to find out what appellant was doing there off the roadway on the railroad tracks. Rhyman thought being on the railroad tracks was an offense, and in any event was suspicious since the car was 35 to 40 yards from the nearest street. Appellant produced his driver's license and explained that he thought the nearest street was a through street and that he inadvertently got stuck on the tracks. Rhyman was content with this explanation and had no intention of arresting appellant or citing him.

Rhyman began to fill out a field interrogation card, containing appellant's name, purpose for being in the location, and his destination. It was "always in the back of [Rhyman's] mind" that a yellow vehicle had been mentioned in the 8:07 p.m. broadcast. He was preparing the field interrogation card because of that initial broadcast. Within two to three minutes after Rhyman first had made contact with appellant, and while filling out the card, a second broadcast came over Rhyman's portable radio describing the suspect involved in the kidnaping. The broadcast informed Rhyman a yellow Vega was involved and gave a detailed description of the suspect: probable Mexican male adult, early 20's, with tattoos, wearing a white T-shirt and Levi's. Since appellant and his car matched the description and the railroad tracks were only four or five miles from the reported crime scene, Rhyman detained the appellant and radioed for assistance. If the second broadcast had not been received, Rhyman would have let appellant go after completion of the field interrogation card. He detained appellant until the sheriff's officers arrived at about 8:45 p.m., whereupon appellant was formally arrested.

Rhyman described field interrogation cards as being made for police reference in suspicious circumstances. The purpose of such cards is for identification of the person at a particular location, his reason for being there, the time, and the reason for contact with the person. The cards are turned over to the detectives. Rhyman felt the card on appellant might somehow be helpful to those investigating the attempted kidnap incident.

■ Appellant does not challenge the legality of his initial detention. Nor does he challenge the detention after the second broadcast. Instead, he argues his continued detention immediately after Rhyman had decided not to arrest or issue a citation was unreasonable and unlawful and the evidence produced

---

[4]These people apparently were neighborhood residents who responded to the driver's obvious plight.

as a result should have been suppressed.[5] The detention, although short, was a "seizure" of appellant's person and therefore is subject to the reasonableness requirement of the Fourth Amendment. (*Dunaway* v. *New York* (1979) 442 U.S. 200, 207 [60 L.Ed.2d 824, 832, 99 S.Ct. 2248].)

## I

The scope of appellate review of a trial court's ruling on a motion to suppress evidence involves a two-step process.

In the first step, the appellate court reviews the trial court's finding of facts relative to the challenged search or seizure. The trial court has the power to decide, for example, what the officer actually perceived, or knew, or believed, and what action he took in response. For the purpose of finding those facts, " . . . the power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor the exercise of that power, and the trial court's findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence." (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]; *People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961].)

The second step of the process involves appellate review of the trial court's decision, based on the factual findings, of the reasonableness of the search within the meaning of the Constitution. (*People* v. *Leyba, supra,* 29 Cal.3d at p. 597.) Because the issue of the reasonableness of a search is a question of law, the appellate court is not bound by the substantial evidence standard in reviewing the trial court's decision thereon. In such review, it is the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness. On that issue, the appellate court exercises its independent judgment. (*Ibid.*) The second step of the process is the only issue involved here since the evidence relating to the search and seizure is undisputed.

Given the propriety of the initial detention, we turn to an evaluation of the reasonableness of the continued detention during the time necessary to complete the field interrogation card. We are hampered somewhat in this inquiry because no evidence was adduced below of how long it would have taken to complete the card. But we infer that it would take no more than a few minutes. All that is required is identification and description of the detainee (which may be taken from the driver's license and visually observed),

---

[5] Appellant sought to suppress (1) observations of him and his automobile subsequent to his arrest, (2) use and observations of his clothes, (3) use and observations of his tires, (4) photographs of him and his car, and (5) all tangible and intangible evidence derived from him or his car subsequent to arrest. Tire tracks of the assailant's automobile had been photographed at the crime scene.

the location and time of the stop, and the interviewee's explanation of what he was doing.

Appellant relies on *People* v. *McGaughran* (1979) 25 Cal.3d 577 [159 Cal.Rptr. 191, 601 P.2d 207] to support his contention that his detention was unduly prolonged. *McGaughran* held that a routine warrant check following a traffic stop cannot detain an offender for a period of time longer than necessary for the officer to perform functions incident to the traffic violation. The detention for an additional period of time solely to conduct a warrant check was held impermissible. The basis was both statutory and constitutional.

The statutory basis for *McGaughran* (*id.*, at p. 586) is not applicable here. For unlike a normal traffic violation where a traffic offender can obtain his release upon giving his written promise to appear (Veh. Code, § 40504, subd. (a)), the officer in the instant case was confronted with a penal violation.[6]

The constitutional basis, however, must be addressed. Officer Rhyman had decided not to cite or arrest appellant for the trespass on the railroad. Because of the proximity in time to the radio broadcast of the attempted kidnap, the geographical proximity (four or five miles from the scene) and the fact that appellant was driving a small yellow car, he decided to make out a field interrogation card.

■ Our Supreme Court has recently summarized rules involving investigative detentions in *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957]: "[I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question. The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. [Citation.]" (Fn. omitted.)

---

[6]Appellant could have been cited for violation of section 369g or 369i. "[¶] Any person who . . . drives . . . any vehicle . . . along the track of any railroad . . . or over its private right of way, without authorization . . . is guilty of a misdemeanor." (§ 369g.)

"Any person who enters or remains upon the property of any railroad without the permission of the owner of such land . . . and whose entry or presence . . . if allowed to continue, would interfere with, interrupt, or hinder the safe and efficient operation of any locomotive, railway car or train is guilty of a misdemeanor." (§ 369i.)

■ Other decisions of the same court have held that circumstances short of probable cause to make an arrest may still justify an officer's stopping motorists for questioning. Federal rules governing police investigations and arrests are in accord, for as the United States Supreme Court recognized in *Terry* v. *Ohio* (1968) 392 U.S. 1, 22 [20 L.Ed.2d 889, 906-907, 88 S.Ct. 1868], "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest."

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to shrug his shoulders and allow a criminal to escape. On the contrary, *Terry* v. *Ohio, supra,* 392 U.S. at page 23 [20 L.Ed.2d at page 907] recognized that it may be the essence of good police work to adopt an intermediate response. The test for determining the lawfulness of the detention is whether, under the totality of the circumstances, it was reasonable.

In *United States* v. *Jackson* (9th Cir. 1971) 448 F.2d 963, two officers heard a broadcast report of a robbery of a liquor store in Phoenix. The robbery had been committed by two black males wearing masks. The officers, who were experienced and familiar with the area, proceeded to an intersection which was on a possible escape route. One minute later, they observed a white Cadillac with three black males inside. They stopped the occupants as possible suspects to detain them temporarily for purposes of making a field interrogation card. (At p. 968.) Defendants moved to suppress evidentiary fruits of the stop. The detention was held lawful, on the basis of *Terry* v. *Ohio, supra,* 392 U.S. 1. The intrusion was relatively innocuous, they were not frisked nor was the Cadillac searched. The police were faced with an emergency—unknown robbers fleeing a crime scene. It was reasonable to stop a car containing three black males, since it was rational to infer that one person would act as lookout or driver. The car was on a probable escape route. It is obvious from the above statement that the facts justifying the detention in the case at bench are substantially stronger.[7]

The temporal and geographic proximity to the crime and the similarity of the car's description gave reasonable cause to detain the appellant for the minimal amount of time necessary to fill out the card. The specific and articulable facts used by the officer in the instant case are much stronger than those relied upon by the officer in *McGaughran*. There, the officer depended upon the fact that the men stopped were not local residents, appeared lost, were not of high school age and were in the vicinity of a high school where illegal drugs were known to exist, drove the wrong way on a one-way street,

---

[7]We do not mean to indicate that *Jackson* states California law extant at the time of the detention. It is cited to indicate the scope of federal law.

and made a furtive gesture when stopped. The officer had no specific crime in mind, but sought only to establish that the occupants of the car were wanted for other crimes, so he instituted a warrant check. (*People* v. *McGaughran, supra,* 25 Cal.3d at p. 588.) In the instant case there was a recently reported crime nearby by one driving a yellow small car. As appellant points out, many automobiles are yellow in color, some of them small cars. A detention of an operator of such a car farther removed in time and place would be outside the bounds of reasonableness. But in the instant case, for Officer Rhyman not to have acted as he did, would have been a failure to properly discharge his duties. (See also *People* v. *Flores* (1974) 12 Cal.3d 85, 91-92 [115 Cal.Rptr. 225, 524 P.2d 353].)

Not only are the facts giving rise to the suspicion stronger in the instant case than in *McGaughran* and particularized in nature, but it bears emphasizing that Officer Rhyman heard the second broadcast two to three minutes *after contacting* appellant, *not* two to three minutes after finishing his discussion with appellant about how he got stuck on the tracks. (Cf. *People* v. *McGaughran, supra,* 25 Cal.3d at p. 587, fn. 7 and accompanying text.)

Field identification cards perform a legitimate police function. If done expeditiously and in an appropriate manner after a lawful stop and in response to circumstances which indicate that a crime has taken place and there is cause to believe that the person detained is involved in same (*In re Tony C., supra,* 21 Cal.3d 888), the procedure is not constitutionally infirm.

II[8]

III

The judgment is affirmed.

Franson, Acting P. J., and Stanton, J.,* concurred.

---

[8]See footnote 1, *ante.*

*Assigned by the Chairperson of the Judicial Council.