[No. C011227. Third Dist. Feb. 26, 1993.]

DIGITAL BIOMETRICS, INC., Plaintiff and Appellant, v.
WILLIAM J. ANTHONY, as Director, etc., Defendant and Respondent;
JOHN BABICH, as Deputy Director, etc., et al., Real Parties in Interest
and Respondents.

J. B. ENTERPRISES, INC., et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents;
IDENTIX INCORPORATED, Real Party in Interest and Respondent.

## COUNSEL

Parker, Milliken, Clark, O'Hara & Samuelian, Paul F. Dauer and James W. Taylor for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Cathy Chirstian, Dennis T. Fenwick and Manuel M. Medeiros, Deputy Attorneys General, and Catherine Close for Defendants and Respondents and for Real Parties in Interest and Respondents Babich et al.

Nielsen, Merksamer, Parrinello, Mueller & Naylor, Paul H. Dobson and James R. Parrinello for Real Party in Interest and Respondent Identix Incorporated.

## OPINION

**SPARKS, Acting P. J.**—In the 1983-1984 fiscal year the Legislature appropriated funds to the Department of Justice (DOJ) to commence a multiyear project to automate its manual fingerprint files and to establish an automated statewide system for identifying latent fingerprints. (See Stats. 1985, ch. 1234, § 1, subd. (a), p. 4242.) In 1985 the Legislature acted to codify the DOJ's authority to develop the system and to provide financial assistance to local law enforcement agencies for the acquisition of remote access equipment. (Stats. 1985, ch. 1234, § 1, subd. (b), p. 4242; see Pen. Code,

§ 11112.1 et seq.) The system is known as the "California Identification System" or "Cal-ID." (Pen. Code, § 11112.1, subd. (a).) The uniform network of equipment and procedures which allows local law enforcement agencies to have direct access to Cal-ID is referred to as the "Remote Access Network" or "RAN." (Pen. Code, § 11112.1, subd. (b).)

In 1989 the DOJ proposed to develop a live-scan fingerprinting network to operate in conjunction with Cal-ID and RAN. A live-scan device electronically scans a subject's fingers to produce an image which can be reduced to a hard-copy fingerprint card by an attached printer onsite or after transmission to another site. Following competitive bidding, the DOJ, in conjunction with the Department of General Services (General Services), determined to award a contract to real party in interest, Identix Incorporated (Identix), for the provision of live-scan equipment to state and local agencies. In these consolidated appeals[1] we consider attempts by various parties to prevent the DOJ and General Services from entering into a contract with Identix. For reasons we shall explain, we agree with the trial court that the plaintiffs' objections are without merit and we shall affirm the judgment denying relief.

### FACTUAL AND PROCEDURAL BACKGROUND

On April 11, 1989, the DOJ and General Services issued request for proposal DOJ-8043 (hereafter the RFP) to elicit bids for the sale and maintenance of live-scan fingerprinting devices. The proposed contract would be for a 5-year period during which a minimum of 100 live-scan devices would be purchased with a potential for the purchase of up to 500 additional units depending upon the needs of local law enforcement agencies. The RFP was 1,400 pages long. Fortunately, it is not necessary to attempt to set forth all of the provisions and requirements of the RFP in order to address the issues on appeal. Instead, we will refer to the provisions of the RFP, where relevant, in conjunction with our discussion of the issues tendered by plaintiffs.

In response to the RFP three bidders submitted a total of five bids as follows: Identix No. 1—$7,371,269; Identix No. 2—$7,666,875; Identix No. 3—$7,962,603; CFA Technologies, now known as Digital Biometrics, Inc. (Digital)—$14,793,586; and NEC Information (NEC)—$15,860,506.[2] An evaluation team composed of representatives of the DOJ and General Services determined that the Identix bids were in compliance with the RFP but

[1]Separate petitions for relief through mandate were filed in the trial court. That court consolidated the petitions for hearing and determination. The parties filed separate notices of appeal and the appeals were assigned case Nos. C011227 and C011229. We consolidated the appeals under case No. C011227.

[2]The bid totals were based upon a fictitious assembly of 120 units in various sites throughout the state. The use of this fictitious scenario was necessary because under the

that the Digital and NEC bids contained material deviations. The equipment proposed in Identix bid No. 1 was subjected to a performance evaluation but failed to meet the image resolution requirements of the RFP. Identix bid No. 2 successfully passed the performance evaluation, and the evaluation team proposed to award the contract pursuant to Identix on bid No. 2.

Digital submitted a letter of protest of the intent to award the contract to Identix. (Pub. Contract Code, § 12102, subd. (f).) Within 10 days Digital submitted a detailed explanation of the bases for the protest. (*Ibid.*) General Services responded that it had found that Digital's bid deviated from the requirements of the RFP in three material respects and thus Digital was not entitled to pursue an administrative appeal of the proposal to award the contract to Identix. The State Board of Control determined that Digital's protest was "entirely without merit" and dismissed it without further hearing. (Cal. Code Regs., tit. 2, § 872.)

Digital petitioned for a writ of mandate to compel the Board of Control to hold a hearing on its protest. Following the issuance of an alternative writ of mandate, the Board of Control vacated its decision dismissing Digital's protest and determined to proceed with an administrative hearing and on that basis moved to dismiss the petition for a writ of mandate. In view of the Board of Control's decision to conduct a hearing on Digital's protest, the trial court declined to issue a peremptory writ of mandate but also refused to dismiss the proceeding on mootness grounds, thus retaining jurisdiction in the matter.

The Board of Control requested the Office of Administrative Hearings to appoint an administrative law judge to conduct a hearing on the protest and to prepare a proposed decision for the Board of Control's consideration. In preparation for the administrative hearing, Digital submitted a document in which it attempted to raise two new objections to the Identix contract proposal, these being that the DOJ and General Services failed to consider compliance with minority and women business participation goals (Pub. Contract Code, § 10115 et seq.), and that the Identix bid included a provision for an unauthorized advance payment for maintenance services. The administrative law judge ruled that the protest issues would be limited to those raised in Digital's detailed statement of protest and that the other issues were not presented in a timely manner. (Pub. Contract Code, § 12102, subd. (f).)

The administrative law judge determined that she would proceed in a bifurcated manner with the first issue for consideration being whether

proposed contract the state would be obligated to purchase only 100 units but the contractor would be obligated to provide up to 500 additional units to local agencies that may wish to participate. Accordingly, for comparison purposes, each bid was adjusted to reflect the total cost under a fictitious 120-unit deployment scenario.

Digital's bid was responsive to the RFP. Consideration of Digital's bases of protest would be necessary only if Digital were to establish that it was a responsive bidder. Following a hearing, the administrative law judge determined that Digital's bid was not responsive to the RFP. Specifically, she found two material deviations from the requirements of the RFP. First, Digital refused to commit to the 100-mile maintenance requirement of the RFP. Second, Digital failed to certify that the live-scan fingerprint images it submitted for independent laboratory (Underwriters Laboratories) testing were derived from the same equipment and ink formula which were being bid.[3] The proposed decision recommended that Digital's protest be dismissed. The Board of Control adopted the proposed decision as its decision in the matter.

Digital filed a supplemental petition seeking review of the Board of Control decision by administrative mandate. (Code Civ. Proc., § 1094.5.) On that same day Digital's attorneys commenced an action on behalf of J. B. Enterprises, Inc., Jim Block, and the California Associations for Better Business, seeking to prevent the DOJ and General Services from entering into a contract with Identix on the grounds that minority and women business participation goals were not considered and that the proposed contract contained a provision for an illegal advance payment.

The trial court consolidated the actions for hearing. Following a hearing the court denied relief in both actions and entered judgment against Digital, J. B. Enterprises, Inc., Jim Block and the California Associations for Better Business. This appeal followed.

DISCUSSION

I. *Digital's Protest*

The RFP and contract in this case are governed by chapter 3, of part 2, of division 2, of the Public Contract Code, commencing with section 12100. In this chapter, the Legislature has created separate state acquisition authority for electronic data processing and telecommunications goods and services.[4] Contracts for the acquisition of data processing or telecommunications goods, whether by lease or purchase, are to be made by or under the supervision of General Services. (Pub. Contract Code, § 12100.)

---

[3]One asserted deviation which had been noted by General Services was resolved favorably to Digital by stipulation pursuant to which the deviation was found not to be material.

[4]These provisions were originally enacted in 1980 as Government Code sections 14816 through 14818. (Stats. 1980, ch. 761, § 3, pp. 2270-2271.) They were moved to the Public Contract Code in 1982. (Stats. 1982, ch. 513, § 4, p. 2292.)

Pursuant to Public Contract Code sections 12101 and 12102, the Department of Finance and General Services are required to maintain, in the State Administrative Manual, policies and procedures governing the acquisition and disposal of electronic data processing and telecommunications goods and services. Public Contract Code section 12102, subdivision (f), provides: "Protest procedures shall be developed to provide bidders an opportunity to protest formally with respect to any acquisition conducted in accordance with this chapter. Authority to protest may be limited to participating bidders. The Director of General Services, or a person designated by the director, is authorized to consider and decide on initial protests. A decision regarding an initial protest shall be final. If prior to making the award, any vendor who has submitted an offer files a protest with the department against the awarding of the contract or purchase order on the ground that his bid or proposal should have been selected in accordance with the selection criteria in the solicitation document, such contract or purchase order shall not be awarded until either the protest has been withdrawn or the State Board of Control has made a final decision as to the action to be taken relating to the protest. Within 10 calendar days after filing a protest, the protesting vendor shall file with the State Board of Control a full and complete written statement specifying in detail the grounds of the protest and the facts in support thereof." (Stats. 1984, ch. 728, § 4, p. 2669.)

Section 5210.2 of the State Administrative Manual provides: "Government Code Section 14816.2(f) [now Public Contract Code section 12102, subdivision (f)] establishes the appeal process available to vendors who believe that the State should have selected their firm rather than another under the competitive rules of the transaction. All formally advertised competitive procurement protests are heard and resolved by the Board of Control. Protests involving informal quotations or protests of the procurement document or process prior to selection announcement will be heard and resolved by the Department of General Services."

In referring Digital's protest to the Office of Administrative Hearings for assignment of an administrative law judge, the Board of Control said: "The hearing should be conducted pursuant to the Board's interpretation of Government Code [sic] Section 12102(f), which requires that the protestant demonstrate that its proposal should have been selected pursuant to the selection criteria in the solicitation document. This requires that the protestant demonstrate first that its proposal is responsive to the RFP, and only if the protestant meets that burden would it be allowed to address the responsiveness of the proposed awardee."

Digital contends that the Board of Control's interpretation of Public Contract Code section 12102, subdivision (f), is erroneous. It argues that it

was entitled to raise any issue it desired before the Board of Control and that the board erred in refusing to consider its contentions unless it first established that it was a responsive bidder under the RFP. This argument is based upon the last sentence of Public Contract Code section 12102, subdivision (f), which requires a protestant to submit a letter specifying the grounds of its protest. Digital asserts that the use of the plural "grounds" indicates that a protestant is not limited to the single "ground" that its bid should have been selected. According to Digital, the reference to a determination by the Board of Control when a vendor asserts that his bid or proposal should have been selected only serves to define the circumstances in which an award of the contract will be delayed pending determination of the protest and is not a limitation upon the issues which may be raised before the Board of Control. We reject this argument.

The Board of Control is an administrative board with limited quasi-judicial powers. (*Lertora* v. *Riley* (1936) 6 Cal.2d 171, 180-181 [57 P.2d 140]; *Hammel* v. *Neylan* (1916) 31 Cal.App. 21, 26-27 [159 P. 618]; see Gov. Code, § 13920, subd. (b).) Its authority is restricted to such matters as are specifically committed to its jurisdiction. (*Ibid.*) With respect to competitive bidding for contracts relating to the acquisition of electronic data processing and telecommunications goods and services, Public Contract Code section 12102, subdivision (f), makes two references to protests. Only one form of protest, the claim that the protestant "should have been selected in accordance with selection criteria in the solicitation document," is committed to the jurisdiction of the Board of Control by express words or necessary implication. The absence of specific statutory assignment of other forms of objection and protest to the jurisdiction of the Board of Control is itself sufficient to support the board's refusal to consider such other matters.

There are additional reasons for upholding the Board of Control's refusal to exercise general jurisdiction over contracts for the procurement of electronic data processing and telecommunications goods and services. To accept Digital's expansive view of the board's jurisdiction would have the effect of giving the Board of Control general supervisorial authority over the procurement of such goods and services. However, general supervisorial authority over the acquisition process is specifically committed to General Services. (Pub. Contract Code, § 12100.) Public Contract Code section 12102, subdivision (f), commits jurisdiction over initial protests to General Services and provides that General Service's decision on such matters shall be final. "Initial" means "of or relating to the beginning." (Webster's Third New Internat. Dict. (1971) p. 1163.) The awarding of a procurement contract is the end rather than the beginning of the competitive bidding process. To conclude that after the selection of an awardee a disappointed bidder can

protest to the Board of Control and raise matters relating to the earlier stages of the process that could and should have been presented to General Services would encroach upon the jurisdiction committed to General Services and would be contrary to the Legislature's declaration that General Services's decision on such matters shall be final.

The Board of Control's interpretation of its jurisdiction over contracts for the acquisition of electronic data processing and telecommunications equipment is consistent with its jurisdiction over state procurement contracts in general. With respect to state procurement contracts, Public Contract Code section 10306 provides: "Whenever a contract or purchase order under this article is not to be awarded to the lowest bidder, the bidder shall be notified by telegram 24 hours prior to awarding the contract or purchase order to another bidder. Upon written request by any bidder who has submitted a bid, notice of the proposed award shall be posted in a public place in the offices of the department at least 24 hours prior to awarding the contract or purchase order. If prior to making the award, any bidder who has submitted a bid files a protest with the department against the awarding of the contract or purchase order on the ground that he or she is the lowest responsible bidder meeting specifications, the contract or purchase order shall not be awarded until either the protest has been withdrawn or the State Board of Control has made a final decision as to the action to be taken relative to the protest. . . ." If the Legislature intended that the Board of Control's jurisdiction with respect to the procurement of electronic data processing and telecommunications goods and services would be more expansive than its jurisdiction over state procurement contracts in general, it would certainly have made express provision for such expanded jurisdiction.[5]

In light of these factors we find the use of the plural "grounds" in the last sentence of Public Contract Code section 12102, subdivision (f), to provide too little support for the expansive jurisdiction of the Board of Control urged by Digital. ■ "Ground" and "grounds" are general terms of relative

[5]The statutory provisions which are now in Public Contract Code section 12102, subdivision (f), were originally enacted as Government Code section 14816.2, subdivision (f). (Stats. 1980, ch. 761, § 3, p. 2272.) As introduced, that measure would have given the Board of Control expansive jurisdiction by providing that initial protests were to be resolved by the Director of Finance with the right of appeal to the Board of Control. (Sen. Bill No. 1579 (1979-1980 Reg. Sess.) as introduced Feb. 27, 1980.) Before it was enacted, however, that provision was amended to give jurisdiction to resolve initial protests to the Director of General Services, to give finality to General Service's resolution of initial protests, and to provide for Board of Control resolution of protests based a bidder's claim that he or she should have been selected for the award of the contract. (See Stats. 1980, ch. 761, § 3, p. 2272.) This legislative history reinforces the Board of Control's conclusion that the Legislature did not intend for it to exercise expansive jurisdiction over contracts for the procurement of electronic data processing and telecommunications goods and services.

meaning. (See *Philbrook* v. *Newman* (1905) 148 Cal. 172, 179 [82 P. 772]; *De Molera* v. *Martin* (1898) 120 Cal. 544, 545-547 [52 P. 825]; *People* v. *Wilkins* (1924) 67 Cal.App. 758, 760 [228 P. 367]; *Pacific Gas & Electric Co.* v. *Rollins* (1917) 32 Cal.App. 782, 787 [164 P. 53]; *People* v. *Preciado* (1916) 31 Cal.App. 519, 522 [160 P. 1090].) Either word may be used to refer to the ultimate basis upon which relief is sought and either word may be used to refer to the reasons or particulars which support the ultimate basis for relief. (*Ibid.*) In considering jurisdictional provisions the courts have always looked to substance rather than form when a statement of the "ground" or "grounds" is required. (*Ibid.*) ▮▮▮ Public Contract Code section 12102, subdivision (f), fits the usual procedural pattern for a requirement that an objecting party explain the basis of a claim for relief. (See *De Molera* v. *Martin, supra,* 120 Cal. at pp. 545-546.) In order to obtain a hearing before the Board of Control a disappointed bidder must file an immediate protest upon the basis or "ground" that his or her bid should have been selected. That claim must be followed up within 10 days with a particularized statement of the reasons or "grounds" supporting that claim. Obviously, there may be multiple reasons asserted in support of the ultimate claim that the protestant's bid should have been selected. We perceive nothing in the use of the plural "grounds" in reference to the particularized statement of reasons that would indicate that the Legislature intended thereby to eliminate all restrictions upon the types of claims that may be considered by the Board of Control in the context of a protest by a disappointed bidder.

For these reasons we conclude that the Board of Control has correctly determined the extent of its jurisdiction and that it properly limited Digital's protest to the claim that its bid should have been selected. Digital does not dispute the Board of Control's finding that it was not a responsive bidder and therefore was not entitled to have its bid selected. Accordingly, the trial court properly denied relief to Digital on its petition for a writ of administrative mandate.

## II. *Participation by Minorities and Women*

One of the issues Digital belatedly attempted to raise before the Board of Control was the alleged failure of the DOJ, General Services and Identix to meet the minority and women business participation goals of the Public Contract Code. (Pub. Contract Code, § 10115.) After the Board of Control denied Digital's protest, Digital petitioned for a writ of administrative mandate urging this issue and contemporaneously enlisted the plaintiffs in the *J. B. Enterprises, Inc.* v. *State of California* action to attempt, as taxpayers and minorities, to prevent the award of the contract to Identix on this

ground. Digital and the *J. B. Enterprises, Inc.*, plaintiffs continue to assert this argument on appeal.

We will consider this issue only on behalf of the *J. B. Enterprises, Inc.*, plaintiffs. ■ Digital's assertion of this issue in its petition for administrative mandate is specious. First, Public Contract Code section 12102, subdivision (f), requires that within 10 days of filing a protest a protestant must file a full and complete statement detailing the grounds and factual support for the protest. Digital filed its protest on July 3, 1990. It did not raise this issue in its detailed statement of protest. Digital first attempted to raise this issue on November 13, 1990, after the Board of Control had referred the matter to an administrative law judge for hearing. Under these circumstances the administrative law judge correctly refused to expand the issues to include this belatedly raised question. (Pub. Contract Code, § 12102, subd. (f).)

Second, the record reveals that after the issuance of the RFP and before bids were due, General Services raised the question at a bidder's conference. Digital submitted a letter to General Services setting forth several reasons that it would be "extremely difficult if not impossible" to meet minority and women participation goals at that time. The reasons included the unique type of equipment required by the RFP which was produced by very few manufacturers, the stringent reliability criteria of the RFP which made it difficult to rely upon unproven vendors, the challenging maintenance requirements which could be satisfied only by a very large and experienced maintenance organization, and the timing of the suggested criteria in the bidding process.[6] General Services did not amend the RFP to impose a minority and women business participation requirement and, as we have noted, it was only after it became clear that Digital would not be awarded the contract that it attempted to prevent Identix from being awarded the contract on this ground. However, since Digital did not itself meet minority and women business participation goals and did not make a timely complaint to General Services of the lack of such a requirement in the RFP, it is clear that Digital was not entitled to raise this question in its protest before the Board of Control. (Pub. Contract Code, §§ 10115.2, subd. (a), 12102, subd. (f).) Accordingly, we proceed to consider the issue only with respect to the *J. B. Enterprises, Inc.* plaintiffs.

The Legislature added minority and women business participation goals to the Public Contract Code by legislation enacted in 1988. (Stats. 1988, ch. 61,

---

[6]Identix submitted a letter reflecting similar concerns. It stated that the equipment it would provide would be manufactured by IBM, Hewlett-Packard, and itself. Identix's bid included the provision of maintenance services by the IBM organization. According to Identix, the unique nature of the equipment and maintenance requirements of the RFP would preclude meeting minority and women business participation goals and would only lead to an expensive and time-consuming "paper trail" that would serve no useful purpose.

§ 3, pp. 327-329.) Public Contract Code section 10115 was enacted to provide: "Notwithstanding any other provision of law, all contracts awarded by any state agency, department, officer, or other state governmental entity for construction, professional services (except those subject to Chapter 6 (commencing with Section 16850) of Part 3 of Division 4 of Title 2 of the Government Code), materials, supplies, equipment, alteration, repair, or improvement shall have statewide participation goals of not less than 15 percent for minority business enterprises and not less than 5 percent for women business enterprises. These goals apply to the overall dollar amount expended each year by the awarding department, as defined by Section 10115.1, pursuant to this article. This article shall not apply to any contract that is subject to Section 10108.5." (Stats. 1988, ch. 61, § 3, p. 327.) In this statutory scheme, " 'Goal' means a numerically expressed objective that awarding departments and contractors are required to make efforts to achieve." (Pub. Contract Code, § 10115.1, subd. (h) [now subd. (g)].)

Public Contract Code section 10115.2 was enacted to provide: "In awarding contracts to the lowest responsible bidder, the awarding department shall consider the responsiveness of a bidder to minority business enterprise and women business enterprise goals set forth in this article. If a bidder fails to show a good faith effort, the awarding department shall award the contract to the next lowest responsive and responsible bidder." (Stats. 1988, ch. 61, § 3, p. 328.) Public Contract Code Section 10115.3 was enacted to provide: "(a) The awarding department shall establish a method of monitoring adherence to the goals specified in this article. [¶] (b) The awarding department shall adopt rules and regulations for the purpose of implementing this article. Emergency regulations consistent with this section may be adopted." Awarding departments are required to submit annual reports to the Governor and to the Legislature on the level of participation by minority and women business enterprises in their contracts and if participation goals are not met the awarding department shall report the reasons and identify remedial steps to be taken. (Pub. Contract Code, § 10115.5.) Finally, Public Contract Code section 10115.6 was enacted to provide: "Notwithstanding any other provision of this article, the failure of an awarding department to meet the goals established under this article shall not affect the validity or enforceability of any contract or any bonds, notes, or other obligations issued by the awarding department to provide for the payment of any contract subject to this article."

Shortly after the effective date of these minority and women business participation requirements, the United States Supreme Court rendered its decision in *Richmond* v. *J. A. Croson Co.* (1989) 488 U.S. 469 [102 L.Ed.2d 854, 109 S.Ct. 706]. There, in a six-to-three decision, the court struck down

the City of Richmond's requirement that nonminority prime contractors on city construction contracts were required to provide a 30 percent set-aside for minority subcontractors. The reasoning of the court was expressed in multiple opinions which, in toto, established that minority preference schemes implicate but will not invariably violate equal protection principles.[7] In light of that decision it became apparent that the validity of California's minority and women business participation legislation would be dependent upon its interpretation and implementation.

In response to the decision in *Richmond* v. *Croson supra*, the Legislature acted to clarify the law in a measure which became effective after the submission of the bids in this case. (Stats. 1989, ch. 1229, §§ 6-9, pp. 4809-4811.) It specified the circumstances in which a bidder would be deemed to have made good faith efforts to achieve minority and women business participation goals. (Pub. Contract Code, § 10115.2, subd. (b).)[8] It provided that nothing in the law shall be construed to authorize an awarding department or contractor to discriminate on the basis of race, color, sex, ethnic origin or ancestry. (Pub. Contract Code, § 10115.7, subds. (a), (b).)

[7]Only part of Justice O'Connor's lead opinion secured the agreement of a majority of the court. Specifically, the majority concluded that the city had failed to demonstrate a compelling interest for the racial set-asides because there was nothing approaching a prima facie case of specific constitutional or statutory violations by anyone in the city's construction industry; past societal discrimination cannot serve as justification for rigid racial preferences; and the inflexible set-asides were not narrowly tailored to remedy the effects of past alleged discrimination. (488 U.S. at pp. 498-508 [102 L.Ed.2d at pp. 884-891].) In the plurality portion of Justice O'Connor's opinion, it was concluded that state and local governments do not have the same powers as Congress to remedy past discrimination and that under the circumstances the city's plan was subject to strict scrutiny review. (*Id.* at pp. 486-498 [102 L.Ed.2d at pp. 877-884].) In a separate opinion Justice Stevens noted that fashioning a remedy for past wrongs is generally a judicial rather than legislative function and expressed the opinion that unless the legislative body identifies both the particular victims and the particular perpetrators of past discrimination a remedial justification for race-based legislation will almost certainly fail. (*Id.* at pp. 511-518 [102 L.Ed.2d at pp. 893-897].) Justice Kennedy expressed the opinion that any governmental racial preference must face the most rigorous scrutiny by the courts but, subject to that standard, the states have the power to eradicate racial discrimination and its effects in both the public and private sectors. (*Id.* at pp. 518-520 [102 L.Ed.2d 897-898].) Justice Scalia would apply strict scrutiny to all racially based classifications and would permit the states to act by racial classification only where and to the extent that such action is necessary to eliminate the state's own maintenance of a system of unlawful racial classification. (*Id.* at pp. 520-528 [102 L.Ed.2d at pp. 899-904].) Justices Brennan, Marshall and Blackmun would have upheld the City of Richmond's law. (*Id.* at pp. 528-562 [102 L.Ed.2d at pp. 904-926].)

[8]Good faith efforts would be shown where contact was made with the awarding department, other state and federal agencies, and local minority and women business enterprise organizations to identify minority and women business enterprises; advertising was published in trade papers and papers focusing on minority and women business enterprises, unless time constraints imposed by the department prevented such advertising; invitations to bid were given to minority and women business enterprises; and available minority and women business enterprises were considered. (*Ibid.*)

And it added a severance provision stating that the invalidity of part of the act would not affect other provisions which could be given effect without the invalid portion. (Pub. Contract Code, § 10115.8.) Effective May 16, 1990, General Services adopted regulations to implement the minority and women business participation goals of the Public Contract Code. (Cal. Code Regs., tit. 2, § 1896.60 et seq.)

 The *J. B. Enterprises, Inc.*, plaintiffs assert that the failure to comply with the minority and women business participation requirements of the Public Contract Code renders the award of the contract to Identix void and entitles them, as taxpayers and minorities, to a judgment preventing the state from performing under the Identix contract. The trial court believed that the Legislature intended that minority and women business participation be accomplished through an administrative regulatory scheme and that to adopt the position of the plaintiffs by implication would be overreaching the judicial prerogative. We agree with the trial court.

The Public Contract Code, like most of our codes, is divided into divisions, parts, and chapters. Division 2, part 2, chapter 2, deals generally with state procurement contracts. That chapter includes section 10420, which provides: "Every contract or other transaction entered in violation of any provision of this chapter is void, unless the violation is technical or nonsubstantive." It also includes section 10421, which provides: "The state, or any person acting on behalf of the state, may bring a civil action seeking a determination by the Superior Court that a contract or other transaction has been entered in violation of any provision of this chapter. If the court finds substantial evidence of such a violation, it may issue a temporary injunction to prevent any further dealings upon the contract or other transaction, pending a final determination on the merits of the case. If the action results in a final determination that the contract or other transaction has been entered in violation of this chapter, it shall be void, and the state or person bringing the action shall be awarded costs and attorney's fees. This section shall not be construed to permit an award of costs and attorney fees to the person or entity contracting or otherwise transacting with the state."

When the Legislature enacted minority and women business participation provisions, it added those provisions to chapter 1, of part 2, of division 2, of the Public Contract Code. That chapter does not include provisions similar to those included for chapter 2 in sections 10420 and 10421.[9] The Legislature did not include provisions similar to sections 10420 and 10421 in the article

---

[9]In addition to sections 10420 and 10421, chapter 2 contains provisions attaching criminal sanctions to corrupt or willful violations of the provisions of that chapter, and imposing double damages for losses caused to the state by such criminal violations. (Pub. Contract

dealing with minority and women business participation goals. In fact, the only provision which refers to the contractual effect of a failure to meet those goals is in Public Contract Code section 10115.6, which provides that a failure of the awarding department to meet the goals shall not affect the validity or enforceability of a contract by the awarding department. Accordingly, the trial court was correct in concluding that there is no express statutory provision supporting the position of the *J. B. Enterprises, Inc.*, plaintiffs and that if such a result is to obtain it must be through implication.

We agree with the trial court's refusal to supply the remedy sought by plaintiffs through implication. The statutory provisions, read as a whole, evidence a legislative intent that implementation and enforcement be accomplished through a regulatory process. The established minority and women business participation goals are applicable to the overall dollar amount expended each year by the awarding department. (Pub. Contract Code, § 10115 [now subd. (c)].) Awarding departments are required to adopt implementing rules and regulations and establish a method of monitoring their adherence to the goals. (Pub. Contract Code, § 10115.3.) The contractual process is under the general supervision of General Services, which has the authority to enforce compliance with the statutory provisions. (See Pub. Contract Code, §§ 10295, 12100.)[10] And each awarding department is required to file an annual report with the Governor and the Legislature in which it assesses its success at meeting its goals, identifies remedial steps it will take if it has not met the goals, and which may form the basis for executive and/or legislative remedial action. (Pub. Contract Code, § 10115.5.)

■ Where the Legislature has specified the means for accomplishing its purposes, the courts should not employ other methods unless such other methods arise by necessary implication. Courts should generally "assume that the Legislature knew what it was saying and meant what it said." (*Pac. Gas & E. Co.* v. *Shasta Dam etc. Dist.* (1955) 135 Cal.App.2d 463, 468 [287 P.2d 841].) "When a statute assumes to specify the effects of a certain provision, we must presume that all the effects intended by the law-maker are stated." (*Perkins* v. *Thornburgh* (1858) 10 Cal. 189, 191. See also *In re*

Code, §§ 10422-10425.) Chapter 1 contains similar provisions, but omits provisions similar to sections 10420 and 10421.

[10]In its regulations General Services has provided that an awarding department must demonstrate compliance with statutory provisions for minority and women business participation in seeking General Services approval of a contract. (Cal. Code Regs., tit. 2, § 1896.60.) These regulations took effect well after the completion of the bidding process in this case. (See Cal. Code Regs., tit. 2, § 1896.63, subd. (a).) The regulations do not suggest that they should be applied to bids which were opened prior to their effective date and General Services seeks to uphold rather than disapprove the determination to award this contract to Identix.

*James M.* (1973) 9 Cal.3d 517, 522 [108 Cal.Rptr. 89 [510 P.2d 33]; *Garson v. Juarique* (1979) 99 Cal.App.3d 769, 774 [160 Cal.Rptr. 461]; *County of Madera v. Superior Court* (1974) 39 Cal.App.3d 665, 670 [114 Cal.Rptr. 283].) And this is particularly true where the Legislature has omitted a provision which it has employed in other circumstances where the asserted effect is intended. (*Educational & Recreational Services, Inc. v. Pasadena Unified Sch. Dist.* (1977) 65 Cal.App.3d 775, 782-783 [135 Cal.Rptr. 594].)

In view of the administrative scheme the Legislature has provided for the accomplishment of its purposes with respect to minority and women business participation goals, and the Legislature's ready use of "void" provisions where it intends such a result, the absence of such provisions with respect to minority and women business participation provisions is conspicuous. There is, as the trial court noted, no basis for implying that the Legislature intended to permit private parties to bring an action to declare a public contract void based upon alleged violations of the minority and women business participation goals of the Public Contract Code. Accordingly, the trial court properly refused to grant relief on this ground.[11]

### III. *Advance Payment*

Although advances in data processing and telecommunications technologies can be a significant boon to efficient law enforcement, to be fully effective, new technologies must be usable within the time constraints required for traditional legal processes. (See *People v. McGaughran* (1979) 25 Cal.3d 577, 584-585, fn. 6 [159 Cal.Rptr. 191, 601 P.2d 207].) In view of these constraints the RFP emphasized the need to keep live-scan fingerprinting devices consistently operational and provided that as part of the purchase contract a bidder would be required to agree to provide maintenance services for a five-year period after the sale of each unit.

During the bidding process Identix submitted a written request for clarification in which it said: "In order to provide the State with maximum cost benefit, Identix plans to propose a 5 year warranty fee as a part of its one time costs per each system. This would allow each local agency to choose the 5 year plan or to negotiate alternate maintenance coverage as it desires. Our bid would have only the one time warranty cost and the monthly maintenance cost summary sheets would be marked 'not applicable.' Please advise us of the responsiveness of this approach to the RFP requirements." The General Services evaluation team responded: "The proposal to offer a 5 year warranty as a one time cost, with the Monthly Maintenance Cost Sheets

---

[11]In light of this conclusion we have no occasion to consider the alternative contention of Identix that the application of the minority and women participation goals to it would be unconstitutional.

marked 'Not Applicable[,'] appears to be responsive to the RFP requirements. DOJ does desire to provide the local agencies, via this procurement, with a known, fixed, monthly maintenance cost which is valid for the life of the Contract. Vendor should indicate, by zone, on a separate set of Monthly Maintenance Cost Sheets what the monthly maintenance costs would be for each zone. This 'alternate' to the 5 year warranty should be clearly marked as an alternate purchase option, and as such, would not be used for cost evaluation purposes."

In its bid Identix stated that its live-scan system does not require routine preventative maintenance other than normal cleaning of the sensor platen, which is a user responsibility. Identix agreed to provide the diagnostic and repair services necessary to keep the equipment operational for the five-year period required by the RFP. The Identix bid permitted a purchaser to choose between a one-time extended warranty fee or to pay monthly maintenance charges throughout the five-year maintenance period. The *J. B. Enterprises, Inc.*, plaintiffs assert that the extended warranty portion of the Identix proposal calls for the state to make an illegal advance payment for services and renders the Identix contract void.[12]

For authority the plaintiffs rely upon a published opinion from the Attorney General concerning whether the Department of Water Resources had the authority to make advance payments for power transmission services. (47 Ops.Cal.Atty.Gen. 11 (1966).) The opinion noted that nothing in the Constitution precluded advance payment but that former Government Code sections 14800 and 14801 required that services be rendered and supplies be delivered prior to submission of a claim. (*Id.* at pp. 12-13.)[13] Accordingly, the opinion concluded that the department lacked the authority to make advance payments in the absence of a statute which expressly or by necessary implication granted that power to the department. (*Ibid.*)[14]

Government Code sections 14800 and 14801 have been repealed. (Stats. 1983, ch. 1231, § 1.5, p. 4764.) The substance of those provisions is now

---

[12]In its petition for a writ of administrative mandate, Digital attempted to raise this issue. Digital is not entitled to raise this issue for the same reasons it cannot raise the minority and women business participation issue. Those reasons are that Digital did not attempt to raise this question in a timely manner before General Services or the Board of Control, and in any event it was not a responsive bidder.

[13]At the time of this opinion, Government Code section 14800 provided: "Immediately upon the rendition of services or the delivery of supplies, the disbursing officer shall transmit the invoice or demand for payment together with his sworn statement to the Controller." (Stats. 1965, ch. 371, § 179, p. 1555.) Government Code section 14801 provided: "Such sworn statement shall show that the services have been rendered and the supplies delivered to the state agency in accordance with the contract and law." (Stats. 1965, ch. 371, 179, p. 1555.)

[14]Plaintiffs also cite the Attorney General's opinion at 54 Ops.Cal.Atty.Gen. 269 (1971), concerning the ability of school districts to begin salary payments prior to the actual

found in Public Contract Code section 10312, which provides: "Immediately upon the rendition of services or the delivery of supplies, the disbursing officer shall transmit the invoice or demand for payment together with his or her sworn statement to the Controller. The sworn statement shall show that the services have been rendered and the supplies delivered to the state agency in accordance with the contract and law." That section is part of chapter 2, of part 2, of division 2, of the Public Contract Code. Contracts for the procurement of electronic data processing and telecommunications goods and services are specifically exempt from the provisions of that chapter. (Pub. Contract Code, § 10430, subd. (b).) Instead, the Legislature has provided separate acquisition authority for such goods and services in chapter 3, of part 2, of division 2, commencing with section 12100. Chapter 3 does not include a provision similar to section 10312.

Chapter 3 of the Public Contract Code does include several provisions which are relevant here. Section 12102, subdivision (b)(1), provides that contract awards shall be based upon "[t]he proposal which provides the most cost-effective solution to the state's requirements, . . ." Section 12102, subdivision (c), provides that "[e]valuation of bidder's proposals for the purpose of determining contract award shall provide for consideration of a bidder's best financing alternative . . . ." And section 12103, subdivision (b), permits consideration of "[s]ystem or equipment component performance, or availability standards, including an assessment of the added cost to the state to receive contractual guarantee of a level of performance."

In view of the inapplicability of Public Contract Code section 10312 and the absence of a similar provision with respect to data processing and telecommunications goods and services, the statutory provisions specifically dealing with the procurement of such goods and services would appear to provide sufficient authority for the state to select the extended warranty option provided for in the Identix bid. However, a definitive answer is not required in the circumstances of this case. The Identix proposal provided for an extended warranty as an option for the DOJ and local agency purchasers of live-scan equipment. The proposal does not require purchasers to select the extended warranty option; rather, it would permit a purchaser to choose to pay for maintenance services on a monthly basis instead. Assuming arguendo that the DOJ lacks the authority to exercise the extended warranty option, that fact would not support the relief sought by plaintiffs, that is, an order declaring that the Identix contract is void, ordering the DOJ and General Services to vacate the decision to award the contract to Identix, and

commencement of services. There, the Attorney General reiterated his earlier view, but found authorization for advance payments in a statute which permitted school districts to pay teacher salaries in 12 equal installments commencing on the 1st of July. (*Id.* at p. 270.)

enjoining the DOJ from purchasing live-scan equipment from Identix. Since the factual and legal circumstances of this case do not support the relief sought by the plaintiffs, the trial court properly entered judgment in favor of the state defendants and Identix.

DISPOSITION

The judgment is affirmed.

Scotland, J., and Nicholson, J., concurred.