662 So.2d 440 (1995)
STATE of Florida, Appellant,
v.
Brandon Ferrell BROOKS, Eubia Undre Walker, Appellees.
No. 94-2484.
District Court of Appeal of Florida, Fifth District.
November 9, 1995.
Robert A. Butterworth, Attorney General, Tallahassee, and Kellie A. Nielan and Rebecca Roark Wall, Assistant Attorney Generals, Daytona Beach, for Appellant.
James E. Taylor, Jr., Orlando, for Appellee Brooks.
James B. Gibson, Public Defender, and Sean K. Ahmed, Assistant Public Defender, Daytona Beach, for Appellee Walker.
PER CURIAM.
AFFIRMED.
HARRIS and ANTOON, JJ., concur.
W. SHARP, J., dissents, with opinion.
W. SHARP, Judge, dissenting.
I dissent in this suppression of evidence case, because in my view the record failed to establish any basis to conclude that Brooks (the driver) and Walker (the passenger), defendants in this case, were unlawfully detained following a valid traffic stop. While Brooks and Walker were being detained, waiting for the result of a radio request for a computer check on Brook's license and a warrant check on both, a back-up deputy arrived with a sniff-dog, who alerted on the car. That gave the deputies probable cause to search the car, resulting in the discovery of a large amount of cocaine.
The trial judge, relying solely on the video tape of the stop and testimony by Deputy McCowen, concluded that McCowen delayed calling in information on the defendants for approximately six minutes, because he suspected the two were drug-couriers without any founded reason, and he hoped the K-9 Unit would get there before he completed writing his ticket. In my view, the trial judge applied a purely subjective standard to this stop, which is not appropriate. See State v. Daniel, 20 Fla. L. Weekly S497, ___ So.2d ___ (Fla. Sept. 28, 1995). After having viewed the tape a number of times myself, I can see nothing wrong with the conduct of this traffic stop and temporary detention.
If this stop involves an unlawful detention, I fear we have made it almost impossible for police officers to conduct their duties without a challenge. The only other decisions I have found in this country, which support the result in this case, are from California. That state apparently has statutes which forbid a police officer who has stopped a driver for a traffic infraction from making a license and warrants check via the radio, unless it is a serious offense. See People v. McGaughran, 25 Cal.3d 577, 159 Cal. Rptr. 191, 601 P.2d 207 (1979). To the contrary, a warrant and license check is standard practice in this state for all traffic stops.
In the past few years, there have been a multitude of cases involving traffic stops, resulting in the subsequent discovery of contraband in the stopped vehicles. Most have unique factual twists, but a few basic principles have been established. If the stop is for a traffic violation and is not pretextual, the police officer is permitted to talk with the driver, tell him or her why they were stopped, and request the person's driver's license, the car registration and information about ownership of the car. See State v. Bass, 609 So.2d 151 (Fla. 5th DCA 1992); Johnson v. State, 537 So.2d 117 (Fla. 1st DCA 1988); The police officer may also ask the driver questions beyond the scope of those matters, although the driver need not answer them. See Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).
The police officer normally calls or radio's in the tag number on the car almost as soon as it is stopped, to be sure the car is not stolen. The information concerning the driver, the driver's license and the car registration takes some time to gather, and it is *441 usually sent in later. This is not an unreasonable search and seizure, or as in this case, an unlawful detention. See State v. Hewey, 144 Vt. 10, 471 A.2d 236 (1983). Florida has no policy against allowing a police officer to radio in information for a license and warrants check on drivers stopped for all traffic violations. It is done in most cases, and McCowen testified he always does so, to be sure he is not dealing with fugitives. The radio check on licenses and warrants normally takes approximately twenty minutes to receive a response. State v. Nugent, 504 So.2d 47 (Fla. 4th DCA 1987).
Another principle evolved in these cases is that the sniff of a K-9 dog around the exterior of a car is not a search or seizure.[1] Thus, if the officer who stops the car for a traffic violation happens to have a sniff dog aboard in the police car, it is lawful to have the dog sniff the exterior of the stopped vehicle at any time while the process of writing the traffic citation, and receiving radio responses is going on. State v. Taswell, 560 So.2d 257 (Fla 3d DCA 1990); State v. Russell, 557 So.2d 666 (Fla 2d DCA 1990). Similarly no argument for unlawful detention can be made, in the case of an officer with a dog aboard who happens by shortly after the traffic stop, while the traffic ticket is being written. See State v. Bass, 609 So.2d 151 (Fla 5th DCA 1992); Blackmon v. State, 570 So.2d 1074 (Fla 1st DCA 1990).
Nor should an unlawful detention be created in the situation where a deputy calls for a K-9 Unit, even if he has no founded suspicion, if the Unit arrives before the police officer has written the traffic citation, and received proper radio ok's on the vehicle and driver. McNeil v. State, 656 So.2d 1320 (Fla. 5th DCA 1995). Only if the car and driver are detained passed that point should the unlawful detention argument arise.[2] However, prior to that point, if the K-9 dog alerts on the exterior of the vehicle, the police have probable cause to search the interior, and further detention of the driver and passenger(s) is lawful.[3]
The record in this case is composed only of Deputy McCowen's testimony and the video tape made at the time of the stop. McCowen's automatic camera on his car ran the entire time, commencing with pulling Brooks' black Buick over on the Turnpike, through to Brooks' and Walker's ultimate arrest. The tape showed that the stop was made at approximately 1:28 p.m., on a sunny day in January. From the camera's point of view, and McCowen's also, there was only one person in the stopped car. The driver, Brooks, immediately climbed out of the Buick and approached the police officer with his wallet and license. He was a young, white man in his early twenties, and was not wearing a shirt. The officer explained why the stop was made. He also asked to see the "paper work" on the car.
They approached the driver's side of the car at approximately 1:29 p.m. Brooks reached in towards the glove box to get the registration papers for the car. It was at this moment that McCowen first saw a second person in the car. From the camera's view, slowly another head appears in the front passenger seat. McCowen testified at the hearing that this surprised him a bit. He immediately backed off and brought Brooks back to the front of his car.
*442 McCowen testified that when he first saw Walker, he appeared to be sleeping in the fully reclined front passenger seat. He observed Walker was not wearing a seat belt. McCowen testified he intended to discuss that with him and give him a warning, since it is a citable offense in Florida not to wear a seat belt.
After returning to the police car, at approximately 1:30 p.m., McCowen called in the Buick's tag via his radio. He told the person who responded that there were two occupants in the stopped black Buick. At this point, McCowen asked Brooks who the passenger was, and where had they come from.
Brooks told McCowen an unusual story. McCowen testified he thought it was "odd." Brooks said they were driving his brother's car. They had driven from Georgia to Miami that day to pick up the passenger's sister, who had been beaten up by her boy-friend, and was in the hospital. He was not sure where they had gone in Miami, but he thought he could find it again, if he had to. When they arrived in Miami, someone, probably the boyfriend of the passenger's sister, told them the sister had left. They thought she had caught a bus back to Georgia, but were not sure. They were thus on their way back to Georgia by themselves. The deputy remarked it seemed odd that they had made such a long trip, and did not know where the sister was going.
The deputy then asked about the passenger. Brooks could not immediately recall his passenger's given name. He called him "Fish". He said he thought his name was "Eubia", or something like that. After a few minutes he recalled the man's last name was Walker. But, Brooks had asserted that he had known him for several years, and the sister as well. At the hearing the deputy testified Brooks appeared to be nervous. The tape does not reveal nervousness so much as it shows Brooks gesturing while telling his story, looking across the highway, up in the air, but, as the officer said, not really making eye contact with him.
At this point in the stop, McCowen called for a back-up, the K-9 Unit, that he thought was patrolling the Turnpike somewhere nearby. He used a code word, so Brooks was not aware such a call had been made. McCowen had no founded suspicion to search the car, or detain it any longer than necessary to discharge his duties in enforcing the traffic laws. However, his suspicions were aroused. The clock on the camera sets this call at 1:33 p.m., give or take some seconds one way or the other.
Continuing his conversation with Brooks, McCowen asked him if he were on probation. Brooks said he was on probation for a charge in Georgia which arose out of a violation of a hunting law of some kind. The deputy asked him for his "traveling" papers, explaining that when a person in another state leaves the state after being put on probation, that person's probation officer usually provides the person with papers to show consent to travel to another state. Brooks said he did not have any such papers.
McCowen testified at the hearing he intended to either ticket the passenger for not wearing a seat belt or give him a warning. Although he had all the information he needed to radio in a check on Brooks, he did not have it on the passenger. He testified it was his custom and practice to obtain the necessary information and radio it all in one call, rather than piece-meal.
McCowen then approached the passenger to obtain his correct name and identification, if available. The passenger, a tall black man in his thirties, identified himself as Eubia Walker. But he had no personal identification with him in the car. He confirmed Brooks' story about his sister and the reason for their turn-around one day trip to Miami from Georgia. He said he "guessed" they had missed her, and he "guessed" she was on her way back to Georgia. McCowen testified Walker also refused to make eye contact with him. He further testified he thought the situation was even stranger, as neither Brooks or Walker seemed particularly upset nor concerned about the missing sister.
At 1:39 p.m., McCowen called the necessary information in on his radio to make a license and warrants check on Brooks and Walker. This call took two minutes because he was interrupted with the radio response to his call on the car's tags. That information *443 was satisfactory. He began writing up the traffic ticket he intended to give Brooks. He continued to chat with Brooks from time to time, explaining that he was waiting for the radio response to his request for a license check. At no time did McCowen appear hostile or threatening.
At 1:46 p.m., the K-9 Unit appears on camera, although McCowen testified they arrived at 1:42 p.m. The K-9 deputy and dog made two external sweeps of the Buick. The dog made a positive alert on the car at 1:48 p.m., McCowen told Brooks the deputy then had probable cause to search the car, and a search began. At 1:50 p.m., the deputy located a large amount of cocaine in the Buick.
At 1:55 p.m., the information on Walker was received over Deputy McCowen's radio. At 1:56 p.m., the information on Brooks came in. Both reports were satisfactory. But for the advent of the K-9 Unit, and the alert of the sniff-dog, they would have been free to go.
In summary, from the beginning of the traffic stop until the time the K-9 dog alerted on the car, 20 minutes elapsed. From the time of the stop to the time the information on Walker and Brooks came back, 27 minutes elapsed. Had McCowen sent in the license and warrants check information on Brooks when he first obtained it, at about the time he called for the K-9 Unit, at 1:33 p.m., (about six minutes earlier than he actually did) the radioed information on Brooks still would have come back four minutes after the dog alerted on the Buick, and at about the time the cocaine in the car was discovered by the deputy. And, a theoretical twenty minute span from the time McCowen first could have called in the information on Brooks (at 1:33 p.m.) still puts the theoretical radio return of information (twenty minutes) well past the time of the alert and arising of probable cause to search.
The trial court ruled that McCowen intentionally delayed the issuance of the traffic citation and radioing in of the information regarding Brooks and Walker in order to create sufficient time for the K-9 Unit to arrive at the scene of the stop. Thus, she concluded, they were being unlawfully detained at the time the dog alerted on the Buick. In my view, there is no basis in this record to support such a finding.
The Florida Supreme Court recently explained the proper test by which the reasonableness of a traffic stop should be judged. See State v. Daniel, 20 Fla. L. Weekly S497, ___ So.2d ___ (Fla. Sept. 28, 1995). I submit the same test should be used to judge the reasonableness of a detention following a valid traffic stop. The court said that a trial judge passing on whether to suppress evidence in this context, should make an objective assessment of the police officer's actions in light of the facts and circumstances confronting him or her, at the time of the stop. Would the conduct of the traffic investigation be the same, despite any improper motive? If the answer to this question is yes, then the detention should be deemed lawful, even if a pretextual motive may have influenced the officer's actions.
In this case, there was a valid basis for the traffic stop and a temporary detention pending resolution of the traffic stop issues. This included a tag check on the car, and at least a license and warrants check on the driver. The trial judge concluded, based on no evidence or testimony in this record, that McCowen's investigation of Walker for not wearing a seat belt was pretextual. However, McCowen testified he intended to give Walker at least a warning for this offense, and that he has done so in prior cases.
Again applying Daniel, the proper test for this court on appellate review of such a ruling is to determine whether there was substantial competent evidence for this conclusion. If the evidence is in conflict, the factfinder's decision must be accepted. But in this case, there was no conflict.
McCowen testified he observed the passenger's failure to wear a seat belt, while apparently asleep immediately after the stop. He also testified he intended to either ticket him or give him a warning. In order to do so, he needed to obtain the passenger's proper identification. He also testified it was his practice to collect all of the information on the driver or passenger, and send it in together. *444 Nothing contradicted this officer's testimony on those points.
In Daniel, the court said:
[A] record containing uncontroverted and believable evidence supporting only a single theory means the trial court must accept that theory as fact, even if the theory is based entirely on the arresting officer's testimony... . Any other ruling is plain error.
Daniel, 20 Fla. L. Weekly at S500, n. 2, ___ So.2d at ___, n. 2.
Thus, I submit the trial court's finding that McCowen's questioning about his identity before giving him a warning about not wearing a seat belt was pretextual, was erroneous.
However, even assuming that McCowen intentionally delayed sending in the radioed information on Brooks by talking with Walker for six minutes, it is clear from the record in this case that the delay had absolutely no factual impact. The K-9 Unit arrived and the dog alerted before the information came back on Brooks, and also before it would have come back six minutes earlier. Thus, even if the six-minute delay were pretextual, it played no part in holding Brooks the total of twenty minutes necessary to obtain the sniff dog alert.
Bound as we are to interpret the constitutional prohibitions against unreasonable searches and seizures, in a manner consistent with the United States Supreme Court,[4] we should not only follow that Court's specific rulings, but also we should accept its general philosophy concerning the Fourth Amendment. In United State v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Court said that the Fourth Amendment imposes no rigid time limitations on investigative detentions and that a twenty-minute stop was not unreasonable when the police were acting diligently and reasonably. The Court said judges need to consider the law enforcement purposes served by the stop, as well as the time reasonably required to carry them out. "[C]ommon sense and ordinary human experience must govern over rigid criteria." 470 U.S. at 685, 105 S.Ct. at 1575. And the Court warned, courts "should not indulge in unrealistic second guessing." 470 U.S. at 686, 105 S.Ct. at 1575. It observed:
A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, itself, render the search unreasonable... . The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize it or to pursue it.
470 U.S. at 686-87, 105 S.Ct. at 1575-76.
I think it is a mistake to require police officers to follow a strict time schedule in calling in information in the course of a traffic stop. If there is a valid basis to send in the information on the passenger as well as the driver, the deputy should be given the benefit of the doubt. No unlawful detention should arise out of facts like those in this case, which show on an objective basis, that the deputy reasonably and diligently carried out his duties regarding the traffic stop, and they were not then complete when probable cause to search arose.
NOTES
[1] See United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); State v. Orozco, 607 So.2d 464 (Fla. 3d DCA 1992), rev. denied, 614 So.2d 503 (Fla. 1993); Blackmon v. State, 570 So.2d 1074 (Fla. 1st DCA 1990); State v. Taswell, 560 So.2d 257 (Fla. 3d DCA 1990); State v. Williams, 565 So.2d 714 (Fla. 3d DCA 1990), rev. denied, 576 So.2d 295 (Fla.), cert. denied, 500 U.S. 955, 111 S.Ct. 2265, 114 L.Ed.2d 717 (1991); Cardwell v. State, 482 So.2d 512 (Fla. 1st DCA 1986).
[2] See Cooper v. State, 654 So.2d 229 (Fla. 1st DCA 1995); Powell v. State, 649 So.2d 888 (Fla. 2d DCA 1995); Rouse v. State, 643 So.2d 696 (Fla. 1st DCA 1994); Sims v. State, 622 So.2d 180 (Fla. 1st DCA 1993); Bozeman v. State, 603 So.2d 585 (Fla. 2d DCA 1992); Blue v. State, 592 So.2d 1263 (Fla. 2d DCA 1992); Dunbar v. State, 592 So.2d 1230 (Fla. 2d DCA 1992); State v. Anderson, 479 So.2d 816 (Fla. 4th DCA 1985).
[3] See State v. Orozco, 607 So.2d 464 (Fla. 3d DCA 1992), rev. denied, 614 So.2d 503 (Fla. 1993); Rogers v. State, 586 So.2d 1148 (Fla. 2d DCA 1991); Blackmon v. State, 570 So.2d 1074 (Fla. 1st DCA 1990); State v. Taswell, 560 So.2d 257 (Fla 3d DCA 1990); Cardwell v. State, 482 So.2d 512 (Fla. 1st DCA 1986).
[4] Art. 1, § 12, Fla. Const.