GRIFFIN, J.
 

 Houston Whitfield [“Whitfield”] appeals his judgment and sentence for trafficking in over twenty-eight grams of cocaine. He pled nolo contendere to the charge, reserving his right to appeal the denial of his motion to suppress evidence of the cocaine seized during the search of an automobile. Whitfield contends that the cocaine was discovered in his vehicle pursuant to an illegal detention, and thus should have been suppressed. We agree and reverse.
 

 The evidence and testimony presented at the suppression hearing revealed that the arresting officer, Florida Highway Patrolman, James Barley [“Trooper Barley”], initiated a traffic stop for unlawful speed on the turnpike in Osceola County.
 
 [1]
 
 Whitfield was driving a rental car with his son as a passenger. They were on their way back to Georgia from the South Florida area. Upon stopping Whitfield, Trooper Barley asked Whitfield to step out of the car and asked for his driver’s license. He had Whitfield return with him to the trooper’s vehicle. Though not apparent from the video, Trooper Barley testified that Whitfield was nervous throughout the encounter. Trooper Barley said that he engaged Whitfield in idle conversation to calm him down. This consisted of a series of rapid-fire questions on a wide range of topics, beginning with, “What are you up to today?”
 
 [2]
 
 While he waited for dispatch to report back on the status of Whitfield’s driver’s license and warrants check, Trooper Barley asked Whitfield his occupation. Whitfield answered that he was in the commercial lawn care business. Trooper Barley asked him about the type of equip
 
 *789
 
 ment Whitfield used in his business. Trooper Barley testified that he did not believe Whitfield owned his own business because Whitfield gave him common brand names of equipment, not brands Trooper Barley knew were used for commercial purposes.
 

 After checking Whitfield’s license, at approximately six to seven minutes
 
 [3]
 
 into the traffic stop, Trooper Barley, for the first time, inquired about the car’s registration. He required Whitfield to remain by his police vehicle while he went up to the passenger side of Whitfield’s car and asked the son to give him the papers. As he did so, he proceeded to ask the son a series of questions similar to those he had been asking Whitfield.
 

 When Trooper Barley’s review of the rental car documents revealed that Whitfield was not the renter of the vehicle, Whitfield told Trooper Barley that his friend, “Terry,” had rented it because Whitfield did not have a credit card. Whitfield said he went to Avis and was added as an additional driver. The rental agreement did have a page attached that listed Whitfield as an authorized driver. At approximately twelve minutes into the stop, Trooper Barley ran a check to verify the car was not reported stolen.
 

 Fifteen minutes into the stop, Trooper Barley inquired whether Whitfield had a criminal record. Whitfield admitted to numerous past arrests. The next several minutes were then taken up with questions about which crimes he had been arrested for, which were the most serious, which were the most minor, whether any were homicides, and the like. Then, eighteen minutes into the traffic stop, Trooper Barley asked Whitfield a series of questions about whether he had any contraband, narcotics, weapons, or large sums of cash in the car. Whitfield answered “no” to all of his questions. Trooper Barley then asked Whitfield for consent to search his car. Whitfield declined, citing the delay and the rain. As a result, at 19:55 minutes into the traffic stop, Trooper Barley called for a K-9 unit.
 

 Immediately thereafter, although Trooper Barley had confirmed that the rental car was not stolen, he resumed examining the authorized driver documentation, expressing doubt about its authenticity because it was a carbon copy with writing on it. He suggested that “anyone” could attach an authorized driver form to a rental contract. He then informed Whitfield that he was going to verify that he was an authorized driver of the vehicle.
 
 [4]
 
 At 24:53 minutes into the traffic stop, Trooper Barley gave dispatch the long distance number for Avis located on the rental agreement and asked them to find out whether Whitfield was an authorized driver. At 26:13, Trooper Barley can be heard on the video telling dispatch or another officer that “the guy doesn’t want me to search so I am waiting on Harold,” presumably, the K-9 unit. At 26:45 on the video, the K-9 unit is seen driving past their location on the opposite side of the turnpike.
 
 [5]
 

 Trooper Barley gave Whitfield a completed written warning at 27:26. It was undisputed at the hearing, however, that Whitfield was still not free to leave because Trooper Barley had not yet received
 
 *790
 
 confirmation that Whitfield was an authorized driver of the rental car. At 27:55, Trooper Barley instructed Whitfield’s son to exit the vehicle for the canine sniff. At 28:36, dispatch informed Trooper Barley that Whitfield was an authorized driver. At 28:44 into the stop, the dog cannot be seen in the video and had not begun to search.
 
 [6]
 
 The canine does not appear in the video until 28:57 to begin his sniff search. Shortly, thereafter, the canine alerted, the officers conducted a search and drugs were discovered.
 

 The trial court rendered a written order denying Whitfield’s motion to suppress. Although the trial court found that the stop of Whitfield lasted approximately thirty minutes, because the K-9 unit arrived within a minute of the verification that Whitfield was an authorized driver, he found the delay in conducting the canine search was not unreasonable and Whitfield was not entitled to suppress the evidence.
 
 [7]
 
 Whitfield contends on appeal that the charges against him stemmed from an unreasonably prolonged traffic stop and, therefore, the trial court erred in denying his motion to suppress.
 

 There is no issue in the case concerning the propriety of the traffic stop. A traffic violation creates probable cause to stop the driver of a vehicle.
 
 See McNeil v. State,
 
 656 So.2d 1320 (Fla. 5th DCA 1995). Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. This investigation may include asking the driver for an operator’s license, insurance and registration.
 
 See State v. Robinson,
 
 756 So.2d 249 (Fla. 5th DCA 2000). Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether the driver has any outstanding warrants.
 
 See State v. Brooks,
 
 662 So.2d 440, 440-41 (Fla. 5th DCA 1995) (Sharp, J., dissenting.). However, absent an articulable suspicion of criminal activity, the time an officer takes to issue a citation should last no longer than is necessary to make any required license or registration checks and to write the citation.
 
 Maxwell v. State,
 
 785 So.2d 1277 (Fla. 5th DCA 2001) (citing
 
 Cresswell v. State,
 
 564 So.2d 480 (Fla.1990));
 
 Sands v. State,
 
 753 So.2d 630 (Fla. 5th DCA 2000).
 
 See also Illinois v. Caballes,
 
 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005).
 

 It is well established that the use of a narcotics dog to sniff a vehicle does not constitute a search and may be conducted during a consensual encounter or traffic stop.
 
 Caballes,
 
 543 U.S. at 408-09, 125 S.Ct. 834. However, the canine search of the exterior of the vehicle must be completed within the time required to issue a citation.
 
 Eldridge v. State,
 
 817 So.2d 884, 887 (Fla. 5th DCA 2002). If a properly trained police dog alerts to the presence of illegal drugs during this time period, the officer will have probable cause for a vehicle search.
 
 Id.
 

 Here, Trooper Barley stopped Whitfield’s vehicle for speeding and immediately indicated to Whitfield he was issuing him a written warning for excessive speed. Whitfield’s vehicle could be properly subjected to a canine search as long as the search was done within the time required
 
 *791
 
 to issue the citation, provided the time were not unreasonably prolonged.
 
 Caballes,
 
 543 U.S. at 407, 125 S.Ct. 834. The record in this case reflects that the routine investigation had been completed within approximately twelve minutes after Whitfield’s vehicle was stopped and that the amount of time reasonably required to do the necessary license/warrant checks and issue the citation — even including the several minutes expended on verifying Whitfield’s authority to drive the car — was significantly less than the twenty-nine minutes expended.
 

 In
 
 Sparks v. State,
 
 842 So.2d 876, 877 (Fla. 2d DCA 2003), the deputy had finished writing a citation for driving with a broken headlight before the canine unit arrived twenty minutes after the initial stop, and the court found an illegal detention. Similarly, in
 
 Williams v. State,
 
 869 So.2d 750 (Fla. 5th DCA 2004), an officer stopped Williams for a traffic violation, issued a citation thirty-five minutes later and then conducted a dog sweep, leading to Williams’ arrest. The court found the delay to be unreasonable, and further said that, even if the time had been reasonable, because the officer had already issued the citation before commencing the dog sniff, the detention for the sniff was illegal.
 
 See State v. Brown,
 
 691 So.2d 637 (Fla. 5th DCA 1997) (officer permitted to run drug sniff until traffic stop concluded, unless unreasonably prolonged to do so).
 
 See also Nulph v. State,
 
 838 So.2d 1244 (Fla. 2d DCA 2003).
 

 Here, Trooper Barley had completed all routine investigation within twelve minutes of the traffic stop and, but for the extended interrogation of Whitfield, there is no apparent reason why the citation should not have been issued within a short time thereafter. Because Trooper Barley decided he would confirm that Whitfield was contractually authorized by Avis to drive the vehicle before issuing the citation, eight-and-one-half minutes of the thirty-minute detention were taken up with that question. It is not clear on the record what criminal offense Trooper Barley was holding Whitfield to investigate. In its written order, the trial court indicated that Trooper Barley’s actions were reasonable in light of the recent theft of rental cars in the Central Florida area; however, Trooper Barley had already confirmed that the car was not stolen and no effort was made to determine that the lessee had not given permission for Whitfield to use the vehicle. This investigation extended the traffic stop to more than twenty-eight minutes, which, coincidentally or not, was exactly the same amount of time it took Trooper Barley to get a drug sniff dog on the scene.
 

 We do not see how the length of this stop could be justified by the circumstances. Even adding up separately the amount of time to: (1) run the registration/warrants checks and stolen car checks, (2) complete the warning paperwork
 
 and
 
 (3) verify that Whitfield was authorized to drive the car, the time reasonably required for this traffic stop was several minutes less than the time that was taken. This court has previously disapproved of such desultory, wide-ranging interrogation of the motorist that has nothing to do with the ostensible purpose of the stop.
 
 Maxwell,
 
 785 So.2d 1277. Had the officer started and completed his traffic duties instead of expending the majority of his time asking the motorist about matters having nothing to do with the issuance of a traffic citation, the stop would have been completed before the dog arrived to conduct a sniff search. Time spent by law enforcement asking such questions can rise to the level of unreasonable delay.
 
 Id.
 
 at 1280.
 

 Even assuming, however, that Trooper Barley had the right to continue to detain
 
 *792
 
 Whitfield for twenty-eight minutes in order to ascertain whether he was authorized by Avis to drive the vehicle, the motion to suppress still should have been granted because the search did not begin until after the citation was issued and the purpose of the traffic - stop completed. WTien Whitfield finally was handed the written speed warning at 27:26 minutes into the stop, the K-9 unit had still not begun to search. The trial court made no finding that the dog sniff had occurred by the time Trooper Barley handed over the written warning.
 

 The State urges this Court to approve the search by adopting the
 
 de minimis
 
 rule found in some federal court cases, most notably, out of the Eighth Circuit. This notion, as articulated in
 
 United States v. $404,905.00 in U.S. Currency,
 
 182 F.3d 643, 649 (8th Cir.1999), holds that “when a police officer makes a traffic stop and has at his immediate disposal the canine resources to employ this uniquely limited investigative procedure, it does not violate the Fourth Amendment to require that the offending motorist’s detention be momentarily extended for a canine sniff of the vehicle’s exterior.” Courts applying this rule reject what they perceive to be an artificial distinction between the traffic stop and the time required for the canine sniff, reasoning that “the artificial line marking the end of a traffic stop does not foreclose the momentary extension of the detention for the purpose of conducting a canine sniff of the vehicle’s exterior.”
 
 United States v. Alexander,
 
 448 F.3d 1014, 1017 (8th Cir.2006).
 
 See also United States v. Martin,
 
 411 F.3d 998 (8th Cir. 2005).
 
 [8]
 

 In contrast to the approach of the Eighth Circuit is the view taken by our Eleventh Circuit Court of Appeals. In
 
 United States v. Pruitt,
 
 174 F.3d 1215 (11th Cir.1999), the court held that a detention violated the Fourth Amendment where, on facts similar to this case, the officer who stopped the appellants for speeding spent an inordinate amount of time asking questions about matters unrelated to the stop, culminating in a request for consent to search the car, which was declined. This led to a call for the drug-sniff canine and a delay by the officer in issuing the warning for speeding until the drug dog arrived. In the view of the Eleventh Circuit, after a traffic citation has been processed, a citizen should be free to go, absent reasonable suspicion of criminal activity, or consent.
 
 United States v. Ramirez,
 
 476 F.3d 1231 (11th Cir.2007).
 
 [9]
 

 There is only one case we can find from a Florida court endorsing the
 
 de minimis
 
 rule, and even that was a bare-bones statement in dicta.
 
 State v. Griffin,
 
 949 So.2d 309 (Fla. 1st DCA 2007). In
 
 Griffin,
 
 a canine handler stopped
 
 Griffin
 
 for speeding and failing to maintain a single lane.
 
 *793
 
 Five to ten minutes later, while writing the citation, a second deputy arrived as backup. At the point when the second officer arrived, the canine handler stopped writing the citation and walked the dog around the vehicle. The dog alerted and the police conducted a search of the occupants. The
 
 Griffin
 
 court reversed the conviction on the basis that the dog alert did not authorize a search of the occupants. However, the court went on to say that the delay caused by the officer’s decision to stop writing the ticket to conduct the search was not unreasonable and the intrusion into Griffin’s liberty was
 
 de minimis. Id.
 
 at 315.
 

 We are not persuaded by the State to apply this
 
 de minimis
 
 rule. For one thing, most of the federal cases cited by the State, and
 
 Griffin,
 
 are different from this case in that the canine unit was available immediately. In
 
 Caballes,
 
 the Court specifically noted a distinction between a dog sniff occurring during a routine traffic stop and one occurring during an “unreasonably prolonged traffic stop.” 543 U.S. at 407, 125 S.Ct. 834 (citing to
 
 People v. Cox,
 
 202 Ill.2d 462, 270 Ill.Dec. 81, 782 N.E.2d 275 (2002)). In
 
 Caballes,
 
 because the dog sniff was performed by one officer while a second officer was writing the warning ticket, and the entire episode lasted less than ten minutes, the duration of the traffic stop was not extended. Referring to Cox’s holding that a dog sniff and subsequent discovery of contraband during an unreasonably prolonged traffic stop was the product of an unconstitutional seizure, the
 
 Caballes
 
 court said: “We may assume that a similar result would be warranted in this case if the dog sniff had been conducted while respondent was being unlawfully detained.” 543 U.S. at 408, 125 S.Ct. 834. This suggests that there is a constitutionally significant line of demarcation between a routine traffic stop that includes a dog sniff and one in which a dog sniff is conducted after the investigative procedures incident to the traffic stop have been completed. From the video of the traffic stop contained in the record, it is apparent in this case that the drugs were found after the routine traffic stop had ended and detention for deployment of the canine had begun. Admittedly, the delay was
 
 short
 
 — de
 
 minimis,
 
 if you will — but Florida is not a
 
 de minimis
 
 jurisdiction. In Florida, when the purpose of the traffic stop has been completed, the right to delay the motorist for the conduct of a sniff search expires.
 

 As previously cited Florida cases demonstrate, Florida has not recognized a rule that a completed traffic stop can be extended to conduct a dog sniff search, even if the delay is
 
 de minimis.
 
 In Florida, a sniff search can be conducted before the traffic stop has been concluded, but not after.
 
 See Brown,
 
 691 So.2d at 638. This is a desirable bright-line test, not a subjective measure like
 
 de minimis
 
 that can be applied inconsistently.
 
 [10]
 
 A bright-line rule is preferable for several reasons. First, it eliminates the problem of figuring out how long a traffic stop should have taken and how long is “unreasonably prolonged.”
 
 See
 
 Tracey Maclin,
 
 Police Interrogation During Traffic Stops: More Questions Than Answers,
 
 31 Champion 34, 37-38 (2007). Even trickier is deciding how much time is
 
 de
 
 minimis.
 
 [11]
 
 If a citizen has completed the ordeal of a traffic stop and is entitled to leave, the citizen’s view
 
 *794
 
 of
 
 de minimis
 
 is likely very different from that of law enforcement or a judge sitting in his chambers. Innocent or guilty, a sniff search is not nothing. As Professor LaFave has outlined in his treatise on search and seizure law,
 
 [12]
 
 even if the time spent stalling until the dog arrives is not counted, a dog sniff search does take time to conduct, and is rarely the benign, seamless event that the court dealt with in
 
 Caballes.
 
 As in this case, passengers are ordered from the vehicle, leaving the driver and passengers exposed to the dangers of standing on the shoulder of the roadway. Although in the mind’s eye, these events occur in daylight and good weather, that is not necessarily the case. In this case, for example, although it was daylight, it was raining. The temperature might be very cold or very hot. In Florida, during much of the year, thirty minutes spent standing on the shoulder of a roadway exposed to the sun and heat can easily be an adverse health event. It is a humiliating and, for some, a frightening experience. Wayne R. LaFave,
 
 Search and Seizure: A Treatise on the Fourth Amendment,
 
 § 9.3 (4th ed.) (2009). Sniff searches are not free from error,
 
 [13]
 
 both because of the limitations of the canines and because drug residue can often be found on common items, like currency.
 
 [14]
 
 Even in innocent circumstances, such a search can lead to further intrusive, time-consuming and destructive searches. Although a canine drag sniff may be permissible, if conducted while the motorist is already detained for a traffic ticket, to extend the detention to conduct a sniff search in order to obtain probable cause for a search where none otherwise exists, is unjustified.
 

 Other jurisdictions have reached differing conclusions about how to fit a dog sniff into a traffic stop without violating the motorist’s Fourth Amendment rights. We find sensible the reasoning of the 2008 decision of the Supreme Court of Nebraska,
 
 State v. Louthan,
 
 275 Neb. 101, 744 N.W.2d 454 (2008). In
 
 Louthan,
 
 a traffic stop was initiated for an expired tag. As in this case, the driver declined consent to search the car. After verifying that the driver’s license was valid and there were no outstanding warrants, rather than issue the ticket, the driver was instructed to remain with another officer while the officer who conducted the stop went to his vehicle, retrieved his drug detection dog and conducted a search. Approximately eleven minutes after the initial stop, the dog alerted. The
 
 Louthan
 
 court found the search to be invalid because, unlike in
 
 Caballes,
 
 the drug detection dog was not deployed until after the investigative steps lawfully incident to the traffic stop had been completed.
 
 Id.
 
 The court rejected a scheme that required a subjective evaluation of whether the detention for purposes of a sniff search was “unreasonably prolonged.” Rather, once the traffic stop had ended, the
 
 Louthan
 
 court concluded, the only justification for any continuation of the stop was the existence of reasonable, articulable suspicion of unlawful drug activity.
 
 Id.
 
 at 462. This is consistent with the historical approach of Florida courts.
 

 
 *795
 
 The State argues, alternatively, that, even if the stop were unreasonably prolonged, Trooper Barley had a reasonable, articulable suspicion that Whitfield was engaging in illicit drug activity because: 1) the rental vehicle Whitfield was driving was not rented to him; 2) the rental contract did not contain Whitfield’s name; 3) Whitfield was unduly nervous; 4) Whitfield did not fully disclose his prior criminal record; and 5) Whitfield’s story about his business was not credible. These facts fall short of establishing reasonable suspicion of criminal activity
 
 [15]
 
 sufficient to detain Whitfield past the time reasonably necessary to issue him a citation for speeding.
 
 Eldridge,
 
 817 So.2d at 888.
 

 Here, this traffic stop should have been concluded by the issuance of the written warning long before it was. It was indisputably over when Whitfield finally got his warning for speeding — almost thirty minutes after being stopped. The fact that the dog sniff began a short period of time — a
 
 de minimis
 
 amount of time — after the traffic stop was concluded, does not save the search.
 
 [16]
 

 REVERSED and REMANDED.
 

 MONACO, C.J., and TORPY, J., concur.
 

 [1]
 

 . The entire traffic stop was recorded from the patrol car and admitted into evidence at the suppression hearing.
 

 [2]
 

 . The questions continued along the lines of: "Where is Crawfordville?” "On vacation?” "Family there?” "How are they?” "Where do they live?” "What do you do for a living?” Business slow?”
 

 [3]
 

 . All time references in the opinion refer to the number appearing in the lower left-hand portion of the computer screen as the DVD recording of the stop proceeds.
 

 [4]
 

 . The record suggests that Trooper Barley spent some time vainly looking for a ''local” number because he did not want to incur the cost of a cell phone call.
 

 [5]
 

 .Because the turnpike is divided with guardrails, the K-9 unit had to go two to three miles past their location to turn around.
 

 [6]
 

 . As Whitfield described it at the suppression hearing: "I already had the ticket in my pocket at that point when we was waiting for the officer to go down and come back.”
 

 [7]
 

 . The trial court also expressed at the hearing that Trooper Barley "did everything he could to expedite the stop” because he called for the canine as soon as consent was refused and it took time for the closest canine to get there.
 

 [8]
 

 . Even in the Eighth Circuit, a prolonged delay in completing the stop due to extensive use of questions unrelated to the traffic violation can be a constitutional violation.
 
 United States
 
 v.
 
 Peralez, 526
 
 F.3d 1115, 1121 (8th Cir.2008). In
 
 Peralez,
 
 however, the court found the delay did not cause law enforcement to discover the contraband.
 

 [9]
 

 .
 
 See also United States v. Williams,
 
 2009 WL 3230781 (M.D.Fla. Sept.30, 2009) (extending a stop beyond the time required to issue the warning and detaining the driver for arrival of a drug-sniffing dog once driver has refused consent to search violates Fourth Amendment),
 
 amended on reconsideration,
 
 2010 WL 144870 (M.D.Fla.2010) (because warrants-check still outstanding and traffic warning not issued when sniff search concluded, search was valid.) For an up-to-date discussion of this dichotomy of approach and relevant secondary sources,
 
 see Reid M. Bolton,
 
 Comment,
 
 The Legality of Prolonged Traffic Stops after
 
 Herring:
 
 Brief Delays as Isolated Negligence,
 
 76 U. Chi. L.Rev. 1781 (2009).
 

 [10]
 

 .
 
 See United States v. Everett,
 
 601 F.3d at 492 (6th Cir.2010).
 

 [11]
 

 . There is also the inevitable creep. If a one minute delay is
 
 de minimis
 
 in case No. 1, the two minute delay in case No. 2 is only a
 
 de minimis
 
 amount longer than the acceptable delay in Case No. 1, and so it goes....
 

 [12]
 

 . 4 Wayne R. LaFave,
 
 Search and Seizure: A Treatise on the Fourth Amendment,
 
 § 9.3 (4th ed.) (2009).
 

 [13]
 

 .
 
 Caballes,
 
 543 U.S. at 411-12, 125 S.Ct. 834 (Souter, J., dissenting);
 
 United States v. Limares,
 
 269 F.3d 794, 797 (7th Cir.2001) (error rate of up to 38% acceptable);
 
 United States v. Kennedy,
 
 131 F.3d 1371, 1378 (10th Cir. 1997).
 
 See also
 
 Jeffrey S. Weiner & Kimberly Homan,
 
 Those Doggone Sniffs Are Often Wrong; The Fourth Amendment Has Gone to the Dogs,
 
 30 Champion 12 (2006). LaFave,
 
 supra,
 
 § 9.3.
 

 [14]
 

 .
 
 See generally
 
 Craig Schemer,
 
 Time is of the Es’scents’,
 
 76-Mar. Fla. B.J. 26 (2002).
 

 [15]
 

 .
 
 See Cresswell v. State,
 
 564 So.2d 480, 481 (Fla.1990).
 

 [16]
 

 . In 1990, the First District Court of Appeal decided a case,
 
 Blackmon v. State,
 
 570 So.2d 1074 (Fla. 1st DCA 1990), whose underlying facts are remarkably similar to this case. There, the search was validated precisely
 
 because,
 
 within three or four minutes into the stop, a second trooper arrived with the dog, without being summoned, and concluded the search while the first officer legitimately completed the traffic stop. The court said that appellant did not experience a greater delay than he would have experienced as a result of his traffic violation. The court also ironically remarked that any intrusion into his liberty was
 
 "de minimis."
 
 This
 
 “de minimis,”
 
 however, is a different "de minimis” from the one with which we are dealing. The
 
 Blackmon “de minimis "
 
 refers to the question whether a sniff search was permissible at all, a question that remained in doubt until
 
 Caballes.
 
 543 U.S. at 409-10, 125 S.Ct. 834.